166 P.3d 353

**In the Matter of the TAX APPEAL OF DIRECTOR OF TAXATION, State of Hawai'I, Appellant/Cross–Appellee,**

v.

**MEDICAL UNDERWRITERS OF CALIFORNIA, Taxpayer– Appellee/Cross–Appellant.**

No. 27023.

Supreme Court of Hawai'i.

Aug. 30, 2007.

182

Hugh R. Jones and Damien A. Elefante, Deputy Attorneys General, on the briefs, for appellant/cross-appellee.

Russell L. Ching and Randall I. Morikawa of Ching, Yuen & Morikawa, Honolulu, and Roy Y. Yempuku of the law offices of Roy Y. Yempuku, on the briefs, for taxpayer-appellee/cross-appellant.

MOON C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

Appellant/Cross–Appellee, director of taxation, State of Hawai'i ("director"), appeals from the following orders and judgment of the tax appeal court:[1] (1) the April 1, 2004 "Order Regarding Director of Taxation, State of Hawaii's Motion for Summary Judgment"; (2) the September 13, 2004 "Order Granting Appellee Medical Underwriters of California's Motion for Partial Summary Judgment Filed August 10, 2004"; (3) the September 13, 2004 "Final Judgment"; and (4) the January 18, 2005 order denying the director's motion for reconsideration. On appeal, the director asserts that the tax appeal court erred by (1) *sua sponte* determining that Medical Underwriters of California ("MUC") was subject to the .15 percent general excise tax rate imposed by Hawai'i Revised Statutes ("HRS") § 237–13(7) when it is undisputed that MUC was not licensed as an insurance solicitor or agent, and (2) denying his motion for reconsideration.

Appellee/Cross–Appellant, MUC, cross-appeals from the following judgment and orders of the tax appeal court: (1) the Sep-

1. The Honorable Gary W.B. Chang presided.

tember 13, 2004 "Final Judgment"; (2) the December 20, 2004 "Order Denying Appellee Medical Underwriters of California's Motion for Attorney's Fees and Costs Filed September 27, 2004"; and (3) the December 20, 2004 "Order Denying Appellee Medical Underwriters of California's Motion for Leave to File Amended Answer to Appellant Director of Taxation, State of Hawaii's Notice of Appeal to the Tax Appeal Court Filed July 6, 2000 and to Alter or Amend Final Judgment[.]" On appeal, MUC presents the following points of error: (1) the tax appeal court erred by failing to exempt MUC from the payment of general excise taxes pursuant to HRS § 237–29.7 inasmuch as MUC is an insurance company authorized to do business under HRS chapter 431; (2) the tax appeal court improperly denied MUC's motion for leave to file an amended answer to director's notice of appeal, filed on July 6, 2000, and to alter or amend the final judgment filed September 23, 2004; and (3) the tax appeal court improperly denied MUC's motion for attorneys' fees and costs.

For the reasons that follow, we resolve the director's appeal as follows: (1) the tax appeal court erred by applying the .15 percent tax rate imposed by HRS § 237–13(7) inasmuch as it is reserved for licensed general agents, subagents, and solicitors; and (2) the tax appeal court did not err by denying the director's motion for reconsideration. With respect to MUC's cross-appeal, we hold that: (1) MUC is not an insurance company

exempt from the payment of general excise taxes; (2) MUC's argument that the tax appeal court erred by denying its motion for leave to file an amended answer to the director's notice of appeal, and to alter or amend the final judgment filed September 23, 2004 is moot; and (3) the tax appeal court did not err by denying MUC's motion for attorneys' fees and costs. We therefore partially vacate the tax appeal court's judgment and remand with instructions to enter judgment in favor of the director in the amount of $105,172.04.

**2.** The Board dismissed MUC's appeal as to the 1985 to 1991 assessments due to MUC's failure to prepay.

## I. BACKGROUND

It is undisputed that MUC manages the Hawai'i-based insurance operations for Medical Insurance Exchange of California ("MIEC") and Claremont Liability Insurance Company ("CLIC"), foreign insurers authorized to do business in Hawai'i. Inasmuch as MUC's activities essentially constituted the transaction of insurance business, the insurance division of the Department of Commerce and Consumer Affairs, State of Hawai'i, has consistently construed MUC as an insurer for licensing purposes under HRS chapter 431. As such, MUC has taken the position that it is an "insurance company" exempted from general excise taxes under HRS § 237–29.7. Based upon the perceived exemption, MUC did not file general excise tax returns with respect to, and did not pay general excise taxes on, funds received in exchange for its services rendered to MIEC and CLIC.

In 1999, the director assessed general excise taxes against MUC at a rate of four percent for unreported income received from 1985 through 1999. MUC prepaid and appealed $160,258.45 of the director's assessments for the time period from January 1, 1992 to January 31, 1999 to the Board of Review, First Taxation District ("Board").[2] On June 7, 2000, the Board found that MUC's tax liability was $19,460.36.

On July 6, 2000, the director filed a notice of appeal in the tax appeal court.[3]

### 1. *The parties' motions for summary judgment*

On August 24, 2001, the director filed a motion for summary judgment. Therein, the director alleged the following facts. MUC is the attorney-in-fact for MIEC and the managing agent of CLIC. MUC provides management services to MIEC and CLIC, including selling insurance, making investments, and adjusting, settling, and paying claims. To execute those services, MUC maintains an office located at 1360 South Beretania Street, Suite 405, Honolulu, Ha-

**3.** The Honorable Gary W.B. Chang presided.

wai'i and employs three persons in its claims department. MUC receives a percentage of the premiums it collects on behalf of MIEC and CLIC as compensation for its services. Although MIEC and CLIC were licensed in this jurisdiction as foreign insurers, MUC was not licensed as an insurer under HRS § 431:3–201. MUC was also not licensed as an insurance general agent, subagent, solicitor, or adjuster under HRS § 431:9–201. During the time period in question, MUC did not file any general excise tax returns and paid no general excise tax. Based upon the foregoing factual allegations, the director argued that (1) MUC's income from management services provided to MIEC and CLIC was subject to Hawai'i's general excise tax at a rate of four percent, (2) MUC was not an insurance company authorized to do business under the Hawai'i Insurance Code and was thus not exempt from paying general excise taxes under HRS § 237–29.7, and (3) MUC did not qualify for the reduced .15 percent general excise tax rate available to licensed insurance general agents, subagents, solicitors, or adjusters.

On September 10, 2001, MUC filed a memorandum in opposition. Therein, MUC disputed the director's characterization of MUC, MIEC, and CLIC as separate entities. Rather, MUC claimed that (1) it is the attorney-in-fact for MIEC, a reciprocal insurance exchange, (2) that CLIC is a wholly owned subsidiary of MIEC, and (3) in every tax year since 1981, the insurance commissioner has treated MUC and MIEC as a single enterprise or entity. MUC asserted that the MIEC entity payed gross premium insurance taxes to the director of finance, pursuant to HRS § 431:7–202, and that MUC, as part of the MIEC entity, was not subject to an additional general excise tax. MUC argued further that it should be included within the definition of "insurer" for purposes of the general excise tax exemption by virtue of its status as a constituent of the MIEC entity.[4]

On April 1, 2004, the tax appeal court filed an order partially granting and partially de-

nying the director's motion for summary judgment. The court concluded as follows:

1. [MUC's] business activity most closely approximates that of an insurance solicitor or general agent.

2. Hawaii Revised Statutes ("HRS") section 237–13(7) provides that, "Upon every person engaged as a licensed solicitor, general agent, or subagent pursuant to [HRS] chapter 431, there is hereby levied and shall be assessed and collected a tax equal to .15 per cent of the commissions due to such activity."

3. [MUC] is taxable at the reduced general excise tax rate of .15% on its commissions or compensation for services rendered as the attorney-in-fact.

4. The Court is not ignoring the licensing requirement in HRS § 237–13(7), but believes that the statutory requirements of attorneys-in-fact contained in HRS chapter 431, in effect, satisfy the statutory licensure requirements of HRS § 237–13(7).

5. A determination of the exact dollar amount of tax liability is not adjudicated by this order.

(Some brackets added and some in original.)

On August 10, 2004, MUC filed a motion for partial summary judgment. MUC argued that since the court decided that MUC is subject to a .15 percent tax rate, the only remaining issue is the exact dollar amount, which MUC calculated to be $3,943.95. On August 19, 2004, the director filed a response to MUC's motion for partial summary judgment. Therein, the director did not oppose MUC's calculation of its tax liability in the amount of $3,943.95. Rather, the director clarified that he continued to object to the court's refusal to uphold the assessment at a tax rate of four percent.

On September 13, 2004, the court filed an order granting MUC's motion for partial summary judgment. The court also filed a "Final Judgment," stating as follows:

1. Appellant Director of Taxation, State of Hawaii's appeal filed July 6, 2000 from the Board of Review for the First

---

4. The director filed a reply memorandum on September 12, 2001 and a supplemental memorandum in support on October 2, 2001. MUC

filed a supplemental memorandum in opposition on October 3, 2001.

Taxation District, State of Hawaii's *Decision* dated June 7, 2000 is hereby denied;

2. Appellee Medical Underwriters of California is taxable at the reduced general excise tax rate of 0.15% (Fifteen hundredths of one percent) on its commissions or compensation for services rendered as the attorney-in-fact for Medical Insurance Exchange of California;

3. Appellee Medical Underwriters of California's liability for general excise tax for the period January 1, 1992 through January 31, 1999 is $3,943.95 (Three Thousand Nine Hundred Forty Three Dollars and Ninety Five Cents). [5] Any remaining claims are dismissed with prejudice.

### 2. *The director's motion for reconsideration*

Following the tax appeal court's oral ruling on MUC's August 10, 2004 motion for partial summary judgment, the director filed a proposed order that included the following pertinent finding of fact: "MUC's gross income subject to the general excise tax for compensation for services rendered as an attorney-in-fact to [MIEC] and [CLIC] for the period January 1992 through January 1999, inclusive, totaled $2,629,301.00." MUC filed objections on September 8, 2004, asserting, *inter alia,* that the director's finding of fact

is inappropriate because said proposed "fact" is erroneous and unsupported by any evidence. That appellee treated appellant's general excise tax assessments, as "admissions against interest" under Rule 803 of the Hawaii Rules of Evidence for the purpose of MUC's motion for partial summary judgment, does not convert the assessments into stipulated facts.

[The director's] proposed finding ... should also be rejected because it is factually incorrect. [The] [f]inding ... erroneously states that appellee received "compensation for services rendered as an attorney-in-fact for ... [CLIC]." In fact, [CLIC] is NOT a reciprocal insurance carrier and therefore did not compensate

MUC for services rendered as its attorney-in-fact."

(Some ellipses added and some in original.)

On September 17, 2004, the director filed a motion for reconsideration of the order granting MUC's motion for partial summary judgment, arguing that MUC's objections presented new evidence of genuine issues of material fact when MUC made the following two factual admissions:

1. [MUC] did not receive any compensation or commissions from [CLIC] for services rendered as an attorney-in-fact; and

2. [MUC] does not agree that its gross income subject to the general excise tax for compensation for services rendered as an attorney-in-fact to [MIEC] and [CLIC] for the period January 1992 through January 1999, inclusive, totaled $2,629,301.00.

The director contended that the compensation received by MUC from CLIC was subject to a tax rate of four percent, rather than .15 percent, inasmuch as CLIC was not a reciprocal insurer and MUC was not its attorney-in-fact. The director also averred that MUC created a genuine issue of material fact as to MUC's tax liability inasmuch as it expressly denied receiving gross income in the amount of $2,629,301.00 during the tax period in question. The director pointed out that .15 percent of $2,629,301.00 equals $3,943.95 and that MUC's denial of the gross income amount necessarily means that its calculated tax liability required revision.

MUC filed a memorandum in opposition on September 27, 2004. MUC countered that the .15 percent tax rate applied to its compensation received from CLIC inasmuch as it acted as an "insurance company" for all of CLIC's business in Hawai'i despite its lack of attorney-in-fact status. MUC argued further that calculation of its tax liability was based on the director's own assessments, that the director "had every opportunity to verify CLIC's insurance status and the accuracy of its own assessments," and that "[i]t is simply too late for [the director] to raise ... 'new

---

**5.** The $3,943.95 amount is derived from applying a .15 percent tax rate to MUC's gross income received as compensation for services rendered to MIEC and CLIC, calculated by the director to be $2,629,301.00. The tax appeal court apparently did not award the director interest or penalties.

evidence' as a basis to vacate the Order and Final Judgment herein."

On January 18, 2005, the court filed an order denying the director's motion for reconsideration.

### 3. *MUC's motion to amend*

On September 23, 2004, MUC filed a motion for leave to file an amended answer to the director's "Notice Of Appeal To Tax Appeal Court" and to alter or amend the September 13, 2004 "Final Judgment[.]" Therein, MUC requested consolidation of the adjudication of the 1985–1991 assessments with the present adjudication of the 1992–1999 assessments. The director filed a memorandum in opposition on October 8, 2004, objecting to MUC's motion, *inter alia,* on the grounds that MUC may not cure its failure to perfect a timely appeal with respect to the 1985 to 1991 assessments through a motion to amend its pleadings in the present case regarding the 1992 to 1999 assessments. On December 20, 2004, the court filed an order denying MUC's motion for leave to file an amended answer to the director's "Notice Of Appeal To Tax Appeal Court[.]"

### 4. *MUC's motion for attorneys' fees and costs*

On September 27, 2004, MUC filed a motion requesting an award of attorneys' fees and costs. Therein, MUC asserted that it prevailed on its appeals before the Board and the tax appeal court and that the director's assessments from 1985–1999 were frivolous, wilful violations of law, and in bad faith. On December 20, 2004, the tax appeal court filed an order denying MUC's motion for attorneys' fees and costs.

### 5. *Notices of appeal*

On December 10, 2004, the director filed a notice of appeal from (1) the April 1, 2004 "Order Regarding Director of Taxation, State of Hawaii's Motion for Summary Judgment," (2) the September 13, 2004 "Order Granting Appellee Medical Underwriters of California's Motion for Partial Summary Judgment Filed August 10, 2004," (3) the September 13, 2004 "Final Judgment," and

(4) the January 18, 2005 order denying the director's motion for reconsideration. MUC filed a notice of cross-appeal from the final judgment on December 27, 2004. On January 19, 2005, MUC filed a separate notice of appeal from the following post-judgment orders: (1) the December 20, 2004 order denying MUC's September 23, 2004 motion for leave to file an amended answer and to alter or amend the final judgment; and (2) the December 20, 2004 order denying MUC's September 27, 2004 motion for attorneys' fees and costs.

## II. STANDARD OF REVIEW

When reviewing decisions of the tax appeal court, we have generally stated as follows:

> It is well settled that[,] in reviewing the decision and findings of the Tax Appeal Court, a presumption arises favoring its actions which should not be overturned without good and sufficient reason. The appellant has the burden of showing that the decision of the Tax Appeal Court was "clearly erroneous."

*In re Tax Appeal of Maile Sky Court Co., Ltd. v. City & County of Honolulu,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997) (quoting *City and County of Honolulu v. Steiner,* 73 Haw. 449, 453, 834 P.2d 1302, 1306 (1992)).

> Conversely, "[C]onclusions of law are reviewed under the right/wrong standard." *Gold v. Harrison,* 88 Hawai'i 94, 100, 962 P.2d 353, 359 (1998) (citing *Furukawa v. Honolulu Zoological Society,* 85 Hawai'i 7, 12, 936 P.2d 643, 648 (1997)). Under the de novo or right/wrong standard, this court "examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it." *Id.* (citing *Aickin v. Ocean View Inv. Co., Inc.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997)).

*In the Matter of the Tax Appeal of Gardens at W. Maui Vacation Club v. County of Maui,* 90 Hawai'i 334, 339, 978 P.2d 772, 777 (1999) (brackets in original).

More particularly, the director's appeal and MUC's cross-appeal in the case at bar present questions involving the meaning

of, and interplay between, provisions of HRS chapters 237 and 431. Such are questions of law reviewable de novo. *Id.* ("[T]he meaning of a statute is a question of law that this court reviews de novo.").

## III. DISCUSSION

### A. The Director's Appeal

1. *MUC is subject to the general excise tax at a rate of four percent.*

The director's first point of error asserts that management services provided by MUC to MIEC and CLIC should have been taxed at four percent, as opposed to .15 percent. In order to resolve the issue presented by the director, it is first necessary to address the issue presented by MUC's cross-appeal as to whether MUC is an insurance company exempt from general excise taxes under HRS § 237–29.7.

a. **MUC is not an insurance company under HRS § 237–29.7 and HRS chapter 431, and it is therefore not exempt from general excise taxes.**

■ As mentioned, HRS § 237–29.7 exempts from the payment of general excise tax assessments "insurance companies authorized to do business under HRS chapter 431." MUC, in its opening brief on cross-appeal, urges that it is an insurance company under HRS § 237–29.7 and an "insurer" under HRS § 431:1–202 by virtue of its status as the inseparable operating arm of the MIEC reciprocal insurance exchange.[6]

■ Contrary to MUC's arguments, however, the provisions of HRS chapter 431, article 4, *in pari materia*, evince a legislative intent to recognize a bipartite relationship. *See* HRS § 1–15(1) (1993) ("The meaning of ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."). For example, HRS §§ 431:3–107 and 431:4–405 define a reciprocal insurer and its attorney-in-fact in terms of their relationship with each other, rather than bestowing existential equivalence. *See* HRS § 431:3–107 (1993) ("A reciprocal insurer means an unincorporated aggregation of subscribers operating individually and collectively through an attorney-in-fact common to all such person to provide reciprocal insurance among themselves."); HRS § 431:4–405 (1993) ("Attorney as used in this part, refers to the attorney-in-fact of a reciprocal insurer."). Also, as argued by the director, HRS § 431:4–406 requires the attorney-in-fact to obtain a power of attorney. Indeed, HRS § 431:4–406 (1993) provides as follows:

§ 431:4–406 **Power of attorney.** (a) The rights and powers of the attorney of a reciprocal insurer shall be as provided in the power of attorney given it by the subscribers.

(b) The power of attorney must set forth:

(1) The powers, duties, and compensation of the attorney;

(2) That the attorney is empowered to accept service of process on behalf of the insurer and to authorize the commissioner to receive service of process in action against the insurer upon contracts exchanged;

(3) Except as to nonassessable policies, a provision for contingent several liability of each subscriber in a specified amount, which amount shall be not less than one nor more than ten times the premium or premium deposit stated in the policy.

(c) The power of attorney may:

(1) Provide for the right of substitution of the attorney and revocation of the power of attorney and rights thereunder;

(2) Impose such restrictions upon the exercise of the power as are agreed upon by the subscribers;

---

6. MUC's opening brief does not present any argument with respect to its relationship with CLIC. Accordingly, any such argument has been waived, *see* Hawai'i Rules of Appellate Procedure Rule 28(b)(7) (2005) ("Points not argued ... may be deemed waived."), and the forthcoming analysis will address only whether an attorney-in-fact of a reciprocal insurer is an insurance company or "insurer."

(3) Provide for the exercise of any right reserved to the subscribers directly or through their advisory committee; and

(4) Contain other lawful provisions deemed advisable.

(d) The terms of any power of attorney, or agreement collateral thereto, shall be reasonable, equitable, and no such power, agreement or any amendment thereof, shall be used or effective in this State until approved by the commissioner.

If, as MUC asserts, an attorney-in-fact is the operating arm of the reciprocal insurance exchange, as opposed to a legally distinct agent of the exchange, a power of attorney would seem unnecessary. Moreover, a reciprocal insurance exchange is required to have a subscribers' advisory committee. *See* HRS §§ 431:4–409(a)(7) and 431:4–415 (1993). HRS § 431:4–415 provides the following:

§ **431:4–415 Subscribers' advisory committee.** (a) The advisory committee of a domestic reciprocal insurer exercising the subscribers' rights shall be selected under such rules as the subscribers adopt.

(b) *Not less than three-fourths of the committee shall be composed of subscribers other than the attorney, or any person employed by, representing, or having a financial interest in the attorney.*

(c) The committee shall:

(1) Supervise the finances of the insurer;

(2) Supervise the insurer's operations to such extent as to assure their conformity with the subscribers' agreement and power of attorney;

(3) Procure the audit of the accounts and records of the insurer and of the attorney at the expense of the insurer; and

(4) Have such additional powers and functions as may be conferred by the subscribers' agreement.

(Emphasis added.) These requirements are clearly designed to protect the rights and interests of the subscribers where they do not align with those of the attorney-in-fact. Finally, HRS chapter 431, article 4, is replete with provisions that refer separately to the "attorney" and the "insurer." *See* HRS § 431:4–406 ("The attorney is empowered to accept service of process on behalf of the insurer and to authorize the commissioner to receive service of process in actions against the insurer...."); HRS § 431:4–411(b) (1993) ("The bond shall be in the sum of $25,000 conditioned that the attorney will faithfully account, before a notary public, in a sworn affidavit, for all moneys and other property of the insurer coming into the attorney's hands, and that the attorney will not withdraw or appropriate for the attorney's own use from the funds of the insurer any moneys or property to which the attorney is not entitled under the power of attorney."); HRS § 431:4–415(c)(3) ("The [subscribers' advisory] committee shall ... [p]rocure the audit of the accounts and records of the insurer and of the attorney at the expense of the insurer...."); HRS § 431:4–422 (1993) ("The attorney or other parties may advance to the reciprocal insurer funds as it may require from time to time in its operations.").

Additionally, under analogous circumstances, the Indiana Court of Appeals in *Ind. Dep't of Revenue v. Am. Underwriters, Inc.*, 429 N.E.2d 306 (Ind.Ct.App.1981), *reh'g denied*, 431 N.E.2d 528 (Ind.Ct.App.1982), held that American Underwriters, Inc. ("A–U"), the attorney-in-fact of American Interinsurance Exchange ("Exchange"), was a "distinct entity for tax purposes...." *Id.* at 312. In so holding, the court recognized that the arrangement consisted of a singular enterprise, *id.* at 311, but explained that "in the legal form of the operation, and in the final analysis, a cleavage exist[ed] and the single enterprise [was] compartmented." *Id.* The court elaborated upon the separateness of A–U and the Exchange, as follows:

First, the interests of A–U and the Exchange are divergent, and the interests of the Exchange are not coextensive with those of A–U. According to the contract documents the subscribers are entitled to any profits and assets of the Exchange upon dissolution, and A–U has no interest in those assets. Likewise, the subscribers have no interest in the assets of A–U. All assets of the Exchange are subject to the liability of the insurance operation, but

none of the assets of A–U are available to those claimants. A–U has five wholly-owned subsidiaries in which the Exchange subscribers have no interest. Second, the Exchange is treated for most purposes as an entity by A–U, public institutions, and the public at large. It sues and is sued in the name of [the Exchange]. A–U has loaned the Exchange sums of money for the purpose of increasing the guaranty fund, and A–U has received the Exchange's notes as security. Separate accounts are kept, and the respective assets of A–U and the Exchange are segregated. Bank accounts are kept in the name of the Exchange and checks written in the name of the Exchange. Policies of insurance are written in the name of the Exchange, losses adjusted in the name of the Exchange, and, in general, business is transacted in the name of the Exchange. Federal tax returns are filed in the name of the Exchange. The annual statement to the Indiana Insurance Department is published in the name of the Exchange, and other publications reflect the Investment Portfolio to be in the name of the Exchange and managed by the Indiana National Bank. These documents are not commingled with the personal assets or business of A–U.

*Id.* at 311–12. The court also noted that, having elected to operate as an interinsurance exchange, A–U may benefit from the advantages that flow from the particular business form, but must also accept the attendant disadvantages:

> It was conceded in oral argument by A–U that the principal advantage to writing insurance in this manner is the insulation of liability to A–U in an area of high-risk, substandard insurance. It appears that the organizers of A–U deliberately have selected this statutorily permitted vehicle

of reciprocal insurance and have compartmented the enterprise to achieve that end. Different forms of business enterprises have different legal as well as tax consequences, some advantageous, and some disadvantageous. On the one hand, we view A–U as desiring to treat the Exchange as a separate entity to maintain insulation from liability, and on the other hand, as desiring to escape dual taxation by calling itself and the Exchange one single enterprise.

*Id.* at 312. The court thus concluded that the receipt of premiums from policyholders by the Exchange was one taxable event, and "when A–U, as attorney-in-fact acting for the Exchange, paid itself personally ... the premium for its management fee, a second taxable event occurred." *Id.*

Similarly, in the case at bar, MUC's own arrangements with MIEC indicate that it is a separately taxable legal entity. Under MUC's written agreements with MIEC, MIEC owns all investments and corporate accounts of the exchange. MIEC is responsible for the payment of state and federal taxes imposed on the exchange. MUC is to receive premiums paid by subscribers and deposit those premiums into separate accounts held by MIEC. It is conceded that MUC does not share in the liabilities of insurance contracts. *See also In the Matter of Int'l Underwriters, Inc.,* 157 F.Supp. 367, 371 (W.D.Mo.1957) ("[R]isk is an essential factor of the insurance business, and in the absence of risk imposed upon an entity, regardless of the other insurancelike functions it performs, it is not an insurer.").[7] MUC was separately incorporated. MUC files its own corporate income tax returns. MIEC is statutorily mandated to "sue and be sued" in its own name. HRS § 431:4–404 (1993).

---

**7.** The court ultimately concluded that the attorney-in-fact at issue was an "insurance corporation" for purposes of the Bankruptcy Act, inasmuch as Missouri law statutorily imposed the requisite degree of risk on the attorney-in-fact. 157 F.Supp. at 371, 373. For example, Missouri law required the maintenance of "a reserve and guaranty fund for the protection of insureds." *Id.* at 371. The attorney-in-fact was not permitted to assess the subscribers additional charges in the event that "claims for losses exceed[ed] the funds available for payment of losses." *Id.*

Moreover, Missouri law imposed the duty to replenish funds that fall below the statutorily imposed minimum on both the subscribers and the attorney-in-fact. *Id.* However, the court's ultimate conclusion that the attorney-in-fact was an insurance corporation is distinguishable from the present case insofar as this jurisdiction's insurance code imposes no such risk on attorneys-in-fact of reciprocal insurers. Indeed, as mentioned, MUC concedes that it does not share in the liabilities of the insurance contracts.

Under these circumstances, we believe that *Am. Underwriters, Inc.* provides separate and additional grounds supporting the conclusion that MUC maintains a separate identity from, and is not subsumed within, the reciprocal insurer it serves.

Arguing for a contrary result, MUC offers a plethora of subarguments, which we address in turn.

### i. *Prior codifications*

MUC first refers this court to codifications of the general excise tax and regulatory insurance schemes predating the 1955 recodification of the insurance code. MUC claims that, under the statutory framework in effect at that time, an attorney-in-fact in a reciprocal insurance exchange was considered an insurance company exempt from the payment of general excise taxes. MUC's interpretation of the prior version of the insurance code is plausible. Indeed, the code made no reference to reciprocal or interinsurance exchanges as an insurance entity distinct from its attorney-in-fact. Rather, as MUC points out, the code expressly required an attorney-in-fact to "pay such taxes and fees *for the transaction of business of insurance* as prescribed by law for the transaction of the same kinds of insurance by other insurance companies." Revised Laws of Hawai'i ("RLH") § 6825 (1935) (emphasis added). RLH § 6791 (1935) provided further that

> *[a] company engaged in the business of insurance,* suretyship, or of guaranteeing against liability, loss or damage, or of entering into contracts substantially amounting to insurance, *shall be deemed an insurance company* and shall not transact business unless the business is authorized or permitted by the laws of the Territory, and all laws regulating the same and applicable thereto have been complied with. . . .

(Emphases added.) Thus, it appears that the attorney-in-fact was statutorily deemed the entity transacting the business of insurance and against whom the tax on gross insurance premiums received was assessed. *See* RLH § 6850 (1935) (imposing a tax on gross premiums received from all risks located in and all business transacted in the Territory of Hawai'i). It therefore made sense to construe the attorney-in-fact (the entity charged with payment of the tax on insurance premiums) as the entity to which the benefit of the exemption from the payment of general excise taxes inured.[8]

However, even if we were to accept the proposition that the 1935 codification of the insurance code contemplated the attorney-in-fact in a reciprocal exchange as an insurance company, we disagree with MUC's subsequent assertion that the recodification of the insurance code in 1955[9] did nothing to alter the plausibility of that interpretation. Particularly persuasive is the legislature's repeal of RLH §§ 6825 and 6791 (1935). *See* 1955 Haw. Sess. L. Act 277 at 564.[10] As discussed *supra*, the provisions of the insurance code currently at issue appear to recognize a bisection between a reciprocal insurance exchange and its attorney-in-fact. Hence, MUC's reference to repealed statutes is unavailing.

### ii. *The trade meaning rule*

Equally without merit is MUC's attempt to invoke the trade meaning rule of statutory interpretation, expressed in *In re Taxes, Hawaiian Pineapple Co., Ltd.,* 45 Haw. 167, 363 P.2d 990 (1961) ("*Hawaiian Pineapple Co.*").

In *Hawaiian Pineapple Co.,* the taxpayer was the operator of a pineapple cannery located in Honolulu. 45 Haw. at 169, 363 P.2d at 992. In 1945, taxpayer commenced with the manufacturing of frozen pineapple prod-

---

8. In 1935, the legislature levied a general excise taxes against "persons on account of their business and other activities in this Territory. . . ." 1935 Haw. Sess. L. Act 141 at 77. The legislature exempted from the payment of such taxes, *inter alia,* "[i]nsurance companies which pay the Territory of Hawaii a tax upon their gross premiums under the provisions of the Revised Laws of Hawaii 1935, chapter 224. . . ." *Id.* at 83.

9. *See* 1955 Haw. Sess. L. Act 277 at 377–565.

10. RLH § 6791 (1935) was recodified as RLH § 8462 (1945). 1955 Haw. Sess. L. Act 277 repealed RLH § 8462 (1945). RLH § 6825 (1935) was recodified as RLH § 8500 (1945). 1955 Haw. Sess. L. Act 277 repealed RLH § 8500 (1945).

ucts which necessarily involved the packing of frozen pineapple products in hermetically sealed cans. *Id.* at 169–70, 363 P.2d at 992–93. The tax commissioner took the position that taxpayer's manufacturing process involved "canning," within the meaning of a statute that imposed a higher general excise tax rate on "canning" and assessed the taxpayer accordingly. *Id.* at 171, 363 P.2d at 993. On appeal before the Tax Appeal Court, the taxpayer presented the testimony of several expert witnesses testifying that freeze-packing food does not involve sterilization by the use of heat, and therefore would not be referred to as "canning" by the food industry. *Id.* at 176, 363 P.2d at 996. The Tax Appeal Court agreed with the taxpayer and set aside the tax commissioner's assessment. *Id.* at 173, 363 P.2d at 994.

On appeal, this court framed the issue as: "Does the process of freezing pineapple products in hermetically sealed cans constitute 'canning' within the meaning of the statute?" *Id.* at 173, 363 P.2d at 995.

We subsequently concluded that the tax statute made express reference to a particular trade or industry—canning—and that the applicable maxim of statutory interpretation was the trade meaning rule, expressed as follows:

> If the act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction, knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words.

*Id.* at 178, 363 P.2d at 997 (citation omitted). We explained that the party asserting the trade meaning must prove its acceptance in the trade or industry, *id.* at 179, 363 P.2d at 997, and, if proved, the result is a presumption in favor of the trade meaning subject always to "the cardinal principle that, the legislative intent, however evinced, must be given effect." *Id.* at 181–82, 363 P.2d at 998.

Applying the rule, we concluded that the "uncontradicted proof" presented by the taxpayer was that "the trade meaning of 'canning' and 'canned' excludes frozen foods, however packed...." *Id.* at 179, 363 P.2d at 997. Finding no evidence of a contrary legislative intent, we upheld the trade meaning presumption and affirmed the ruling of the Tax Appeal Court. *Id.* at 194, 363 P.2d at 1005.

■ Here, however, MUC has failed to provide sufficient evidence of a trade meaning. At trial, MUC offered a declaration by Hiram Tanaka ("Tanaka"), who was employed as the "Administrative Assistant, Deputy Insurance Commissioner" and "Chief Deputy Insurance Commissioner of the Insurance Division of the Department of Commerce and Consumer Affairs of the State of Hawaii" from 1974 to 1999. Tanaka's declaration stated, in relevant part, as follows:

6. That the Insurance Division includes reciprocal insurer attorneys-in-fact, such as MUC, in the definition of "Insurer" for the purpose of the exemption of insurance companies under HRS 237–29.7 and considers MIEC and MUC to be a single Insurer for the purposes of the insurance premium tax.

7. That the original legislative intent behind the enactment of the Hawaii Insurance Code was to treat alike all insurers, whether stock, mutual or reciprocal which are subject to the regulatory and taxing statutes.

8. That in addition to the original legislative intent, the statutory interpretation of the Hawaii Insurance Code by the Insurance Division is based, in part, upon the following facts:

- unlike a stock insurer and mutual insurer a reciprocal insurer does not have any employees and is required by statute to be operated by an attorney-in-fact.
- the attorney-in-fact is the reciprocal insurer from an administrative and operations function standpoint
- the reciprocal insurer has already paid the 4.7% insurance premium tax
- the attorney in fact actually performs the insurance work
- and the public policy of encouraging the formation of insurers, including

reciprocal insurers and reciprocal captive insurance companies in Hawaii.

. . . .

11. That the Insurance Division construes the reciprocal insurer and insurance premium tax laws to treat reciprocal insurers as a single unit and the reciprocal insurer attorney-in-fact as exempt from gross excise tax under HRS 237–29.7.

MUC also attached a copy of former insurance commissioner Reynaldo D. Graulty's testimony, presented before the Senate Committee on Commerce and Consumer Protection on February 12, 1999, in support of Senate Bill No. 364. Senate Bill No. 364 proposed to clarify that attorneys-in-fact of reciprocal insurers are exempt from the payment of general excise taxes by HRS § 237–29.7.[11] The former commissioner testified as follows:

The DCCA defers to the Department of Taxation on this bill. We wish to inform the Committee however of the insurance implications of this bill.

Hawaii law specifies that insurance companies formed in the state shall be either an incorporated stock insurer, an incorporated mutual insurer, or a reciprocal insurer. Unlike the stock and mutual insurer, a reciprocal insurer does not have any employees and is required by statute to be operated by an attorney-in-fact. The reciprocal insurers reimburse their attorney-in-facts [sic] for the cost of operating the insurance company. The attorney-in-fact in essence is the reciprocal insurer from an administrative function standpoint. You cannot have a reciprocal insurer without an attorney-in-fact. You cannot have one without the other.

Since the reciprocal insurer pays premium taxes, we understood the original legislative intent to be that the operations of the attorney-in-fact, the entity that actually performs the insurance work, is included in the definition of insurer for the purposes of § 237–29.7, HRS, Exemption of Insurance Companies.

Some of the insurers which write medical malpractice insurance in this state are reciprocal insurers domiciled in California. California has a specific provision in their tax law which clearly exempts the attorney-in-fact of a reciprocal from taxes directly attributable to property used exclusively in or on income derived from the attorney-in-fact's principal business. Hawaii law makes no specific reference and is therefore unclear. SB 364 is Medical Insurance Exchange's attempt to seek a clarification of Hawaii law.

The Insurance Division is sensitive to the potential loss of jobs that might result if this bill is not enacted. One of the admitted reciprocal insurers here has an office with two employees to directly service their Hawaii policyholders. If the reimbursement the attorney-in-fact receives for its Hawaii office operating cost becomes subject to the excise tax, we have been advised that the attorney-in-fact will close its Hawaii office and service the policyholders from their home office in California.

---

**11.** We note that the director argues that the fact that Senate Bill No. 364 was not enacted is evidence of the legislature's intent to subject attorneys-in-fact to the general excise tax. However, although it is possible that Senate Bill No. 364's failure to pass indicates a legislative intent to reject the proposal contained therein, such legislative inaction is not a cogent expression of legislative intent. *See L & R Distrib. Co., Inc. v. Mo. Dep't of Revenue*, 648 S.W.2d 91, 95 n. 5 (Mo.1983) (acknowledging that the failure of a bill to pass may aid interpretation where a statute is ambiguous, but stating that such reliance "provides a tenuous basis" insofar as, "without a record to explain the purpose for which the bill is introduced or a record of debate on the bill when considered, examination of the enactments would not reveal why the legislature rejected a proposed bill."); *Blue Springs Bowl v. Spradling*, 551 S.W.2d 596, 601 (Mo.1977) ("If [the statute] were ambiguous, this legislative history could be construed as one of the aids to statutory construction which a court may use. However reliance on bills not passed provides a tenuous basis for determining legislative intent."); *Escrow Serv. Co. v. Cressler*, 59 Wash.2d 38, 365 P.2d 760, 766–67 (1961) (Finley, C.J., dissenting) ("To hold that every bill of such a. nature introduced into the legislature but not passed by it is a manifestation of legislative intent and a directive to the courts not to effect a change similar to that attempted by the unsuccessful bill approximates ... (1) extreme naivete respecting the nature of the legislative process, and (2) an abdication of judicial function and responsibility that should not be condoned by resort to legal fiction.").

Not only might existing jobs in Hawaii be in jeopardy for attorney's-in-fact [sic] already doing business as reciprocals in this state, but future job creation might also be adversely affected.

The captive insurance law was amended last year to allow the formation of captive insurance companies as reciprocals. One company has already redomesticated its captive to Hawaii as a result of this law change. We expect more reciprocal captive insurance companies will be formed here in the future. Similar to our regular insurance law, the captive law also requires that a reciprocal have an attorney-in-fact. If our excise tax law is interpreted in such a manner as to tax the attorney-in-fact on its principal business for a Hawaii-domiciled reciprocal, this will have the negative effect of discouraging the creation or employment of local entities and personnel as the attorney-in-fact[.] Under a worst case scenario, it will discourage the formation of reciprocal captive insurance companies in Hawaii.

We thank the Committee for the opportunity to comment on this matter.

Hearing on S.B. 364, Sen. Comm. on Commerce & Consumer Prot., 20th Leg., Reg. Sess. (Feb. 12, 1999) (statement of Ins. Comm'r Reynaldo D. Graulty) (on file with committee clerk).

While Tanaka's declaration and the former commissioner's testimony may set forth the insurance division's position as to whether an attorney-in-fact is an insurer, they do not purport to establish an industry-wide understanding. Accordingly, MUC has failed to provide sufficient evidence of a trade meaning and the presumption in favor of that meaning is not triggered.[12]

iii. *Equitable estoppel*

■ MUC also claims that it relied on the insurance division's view that it was an insurance company since 1981. MUC contends that the department of taxation had knowl-

edge of MUC's Hawai'i operations because MUC had been filing Hawai'i income tax returns with the department since 1981, yet did not assess MUC until 1999. MUC argues that it is "patently unfair" to "impose a [general excise tax] upon MUC after MUC has relied to its detriment upon a determination by another state agency...."

The director, on the other hand, asserts that equitable estoppel cannot be applied to interfere with the government's exercise of its sovereign power (*i.e.* the power to tax). The director additionally contends that MUC failed to provide any evidence of "manifest injustice." The director further points out that MUC has not relied to its detriment on any representation of the director. Moreover, the director avers that the department of taxation has no duty to advise MUC of its tax obligations and that, pursuant to HRS § 237–40, the director is authorized to assess MUC at any time insofar as MUC failed to file any annual general excise tax returns.

■ This court has stated that generally, "the doctrine of equitable estoppel is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice." *State v. Zimring*, 58 Haw. 106, 126, 566 P.2d 725, 738 (1977) (citing *Yamada v. Natural Disaster Claims Comm'n for the County of Hawai'i*, 54 Haw. 621, 629, 513 P.2d 1001, 1006 (1973), *abrogated on other grounds by Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 183, 86 P.3d 982, 992 (2004)). However, "significant limitations have been placed on the doctrine in this context." *Filipo v. Chang*, 62 Haw. 626, 634, 618 P.2d 295, 300 (1980). As argued by the director, one of these recognized limitations is that the doctrine of equitable estoppel "may not be used in such a way as to hinder the state in the exercise of its sovereign power." *Id.; see also Godbold v. Manibog*, 36 Haw. 206, 214 (1942) ("The doctrine of estoppel is not applied to the extent of impairing sovereign powers of a state such

---

12. MUC does not argue the related doctrine that the interpretation of a statute by an agency charged with its administration is entitled to deference. *See, e.g., In the Interest of John Doe, born on August 3, 1977*, 73 Haw. 89, 94, 828 P.2d 272, 275 (1992) ("[T]he construction of [a] statute by the agency charged with its administration is entitled to substantial deference.... If the agency's construction is a reasonable one, the court should give deference to it.") (Some brackets added and some in original.) (Ellipses in original.) (Citation omitted.).

194

as it exercises, for example, in the enactment and enforcement of police measures.") (Citation omitted.).

■ It is beyond dispute that the power of taxation is a sovereign power of the state. *See Ignatz v. Commonwealth*, 849 A.2d 308, 313 (Pa.Commw.Ct.2004) ("The sovereign power of taxation ... is in the state....") (Some ellipses added and some in original.); *Lemke ex rel. Teta v. Brooks*, 614 N.W.2d 242, 246 (Minn.Ct.App.2000) (classifying the power to tax as a sovereign power); *Warning Safety Lights of Ga., Inc. v. State, Dep't of Revenue*, 678 So.2d 1377, 1381 (Fla.Dist. Ct.App.1996) (same); *Wash. Public Power Supply Sys. v. Gen. Elec. Co.*, 113 Wash.2d 288, 778 P.2d 1047, 1050 (1989) (same); *Banner County v. State Bd. of Equalization & Assessment*, 226 Neb. 236, 411 N.W.2d 35, 45 (1987) ("The power to tax is a sovereign power...."). As such, the doctrine of equitable estoppel may not be applied against the government's power to tax. *See Fitzgerald v. City of Bangor*, 726 A.2d 1253, 1255–56 (Me.1999) ("The rationale for the rule precluding the assertion of estoppel against the government in tax cases is to assure that no officer of government has the ability to interfere inadvertently with the government's fundamental sovereign power to tax its citizens."); *PCS, Inc. v. Ariz. Dep't of Revenue*, 176. Ariz. 628, 863 P.2d 920, 922 (T.C.1993) ("[T]here can be no estoppel involved against a sovereign state. The failure of the tax commission to attempt to collect taxes now sought to be collected from plaintiff for a period of years constitutes no defense to their collection.") (Citing *Ariz. Tax Comm'n*

*v. Dairy & Consumers Coop. Ass'n*, 70 Ariz. 7, 215 P.2d 235, 240 (1950).). Therefore, MUC's estoppel argument is unavailing.

### iv. *MUC's remaining arguments are without merit.*

MUC also asserts that the legislature's preservation of the term "insurance companies" when it enacted HRS § 237–29.7 in 1991 indicates a legislative intent to continue to exempt from the payment of general excise taxes all entities previously considered "insurance companies," including attorneys-in-fact. However, we can find no evidence of legislative intent supporting MUC's leap in logic.[13] Rather, HRS § 237–29.7 continues to expressly reference HRS chapter 431, and, as discussed *supra*, HRS chapter 431 contemplates the attorney-in-fact as an entity distinct from its reciprocal insurer.

MUC contends that the failure of any director of taxation to assess general excise taxes against attorneys-in-fact of reciprocal insurers "confirms the intent of the law to exempt [attorneys-in-fact] from [tax] liability." However, even assuming that MUC's factual assertion is correct, the mere fact that past directors have not assessed attorneys-in-fact does not require the conclusion that they were not authorized to do so. Rather, that assertion is germane to MUC's estoppel argument, addressed *supra*.

Finally, MUC asserts that it is authorized to do business under HRS chapter 431. However, MUC's authority to transact business under HRS chapter 431 does not inform

13. Prior to 1991, insurance companies were exempted from the general excise tax scheme by HRS § 237–23(a)(4). *See* HRS § 237–23(a)(4) (1985 & Supp.1990). Specifically, HRS § 237–23(a)(4) (Supp.1990) provided that chapter 237 "shall not apply to ... [i]nsurance companies which pay the State a tax upon their gross premiums under chapter 431...." In 1991, however, the legislature repealed HRS § 237–23(a)(4). *See* 1991 Haw. Sess. L. Act 286 § 3, at 692. The legislature simultaneously enacted the following provision:

**237—Exemption of insurance companies.** This chapter shall not apply to the gross income or gross proceeds of insurance companies authorized to do business under chapter 431; except this exemption shall not apply to any gross income or gross proceeds received

after December 31, 1991, as rents from investments in real property in this State; provided that gross income or gross proceeds from investments in real property received by insurance companies after December 31, 1991, under written contracts entered into before the effective date of this Act that do not provide for the passing on of taxes or tax increases shall not be taxed until the contracts are renegotiated, renewed, or extended.

1991 Haw. Sess. L. Act 286 § 1, at 690. The purpose of the 1991 amendment was to ensure that income derived from sources other than premiums on insurance contracts were taxable "at the general excise rate of four percent...." Stand. Comm. Rep. No. 1002, in 1991 House Journal, at 1196.

the question as to MUC's tax liability. Although MUC presented evidence that the insurance division has taken the position that it may authorize an attorney-in-fact to transact business under the certificate of authority granted to it in the name of the reciprocal insurer, it does not necessarily follow that the attorney-in-fact and the reciprocal insurer constitute the same taxable entity.

For the foregoing reasons, we agree with the tax appeal court's implicit conclusion that MUC is not exempt from the payment of general excise taxes under HRS § 237–29.7.

### b. MUC does not qualify for the .15 percent tax rate reserved for licensed general agents, subagents, and solicitors.

Having established that MUC is not exempt from general excise taxes, we turn to the director's argument that the tax appeal court erred by *sua sponte* applying the tax rate of .15 percent reserved for licensed general agents, subagents, and solicitors under HRS § 237–13(7). The director contends that MUC was not licensed, an express requirement of HRS § 237–13(7), and that it therefore could not benefit from the reduced tax rate provided for therein. The director points out that MUC provides management services to MIEC and CLIC, and that any compensation received in exchange for those services is taxable under HRS § 237–13(6) at a rate of four percent. The director argues further that statutes exempting taxpayers from the payment of taxes must be strictly construed.

■ MUC counters that if this court should find that it is not exempt under HRS § 237–29.7, it is alternatively subject to the .15 percent general excise tax rate imposed by HRS § 237–13(7) inasmuch as its business activity most closely resembles that of a general agent or solicitor, as found by the tax appeal court. MUC avers that the certificate of authority under which it operates is the license qualifying it under HRS § 237–13(7).

HRS § 237–13(7) (1993) provides the following:

§ 237–13 Imposition of tax. There is hereby levied and shall be assessed and collected annually privilege taxes against persons on account of their business and other activities in the State measured by the application of rates against values of products, gross proceeds of sales, or gross income, whichever is specified, as follows:

. . . .

(7) Tax on insurance solicitors and agents. Upon every person engaged as a licensed solicitor, general agent, or subagent pursuant to chapter 431, there is hereby levied and shall be assessed and collected a tax equal to .15 per cent of the commissions due to such activity.

■ Preliminarily, we note that HRS § 237–13(7) is plainly worded as a statute of imposition, as opposed to a statute of exemption. Thus, although the director is correct that statutes exempting persons from taxes are to be strictly construed against the taxpayer, *see Hawaiian Pineapple Co.,* 45 Haw. at 189, 363 P.2d at 1002 ("This court has . . . often applied strict construction against a taxpayer and in favor of the government when the ambiguity pertained to an exemption in a taxing statute."); *In the Matter of the Tax Appeals of 711 Motors, Inc.,* 56 Haw. 644, 646, 547 P.2d 1343, 1345 (1976); *In the Matter of the Tax Appeal of Central Union Church—Arcadia Ret. Residence,* 63 Haw. 199, 206, 624 P.2d 1346, 1351 (1981), a contrary rule applies. To wit, statutes imposing taxes are to be strictly construed against the government. *See Hawaiian Pineapple Co.,* 45 Haw. at 189, 363 P.2d at 1002 ("This court has on many other occasions resolved an ambiguity in a statute imposing a tax in favor of the taxpayer."); *In re Hawaiian Tel. Co.,* 61 Haw. 572, 578, 608 P.2d 383, 388 (1980) ("It is a cardinal rule of construction that a statute imposing taxes is to be construed strictly against the government and in favor of the taxpayers . . . .").

■ Nevertheless, these competing rules of strict construction "should only be resorted to 'as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the ambiguity have been exhausted.'" *Id.* at 579, 608 P.2d at 388 (citing

*Bishop Trust Co. v. Burns,* 46 Haw. 375, 399–400, 381 P.2d 687, 701 (1963)). Here, giving effect to all of the words expressed by the legislature, *see Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984) ("It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute."), we think it reasonably clear that the phrase "engaged as a licensed solicitor, general agent, or subagent pursuant to chapter 431," is a direct reference to HRS chapter 431, article 9.

HRS § 431:9–201(a) (1993) unambiguously states that "[n]o person in this State shall act as, be appointed as, or hold oneself out to be a general agent, subagent, solicitor, or adjuster unless so licensed by this State." HRS § 431:9–102 (1993) defines the term "general agent" as:

> any person appointed under section 431:3–203(b)(1) and authorized by the insurer to perform all of the following acts in this State:
>
> (1) Solicit applications for insurance;
>
> (2) Collect premiums on insurance applied for or effectuated;
>
> (3) Appoint subagents and solicitors;
>
> (4) Arrange insurance on subjects located, resident, or to be performed wholly outside this State with an authorized insurer for which the agent is not licensed;
>
> (5) In accordance with the provisions of article 8, arrange insurance on subjects located, resident, or to be performed wholly outside this State with an unauthorized insurer; and
>
> (6) Any other lawful acts pursuant to this article.

HRS § 431:9–103 (1993) defines the term "subagent" as:

> any person appointed by a general agent, or by a domestic insurer upon compliance with section 431:9–102(b) to perform the following acts in this State:

> (1) Solicit applications for insurance;
>
> (2) Collect premiums on insurance so applied for or effectuated; and
>
> (3) Any other lawful acts pursuant to this article.

HRS § 431:9–104 (1993) defines the term "solicitor" as:

> any individual appointed by a general agent or by a subagent or by a domestic insurer upon compliance with section 431:9–102(b), to perform the following acts in this State:
>
> (1) Solicit applications for insurance;
>
> (2) Collect premiums in connection therewith; and
>
> (3) any other lawful acts pursuant to this article.

Here, MUC does not dispute the director's assertion that it does not hold a general agent, subagent, or solicitor license under HRS chapter 431, article 9. Without such a license, MUC could not have been legally appointed as either a general agent, subagent, or solicitor of MIEC, its certificate of authority notwithstanding. Consequently, MUC does not qualify as a "general agent," "subagent," or "solicitor," as defined by HRS chapter 431, and it therefore does not fall within the parameters of the category described by HRS § 237–13(7).

**c. MUC is taxable under HRS § 237–13(6) at four percent.**

Rather, as averred by the director, the applicable taxing statute is HRS § 237–13(6) (1993), which provides, in pertinent part, as follows: "Upon every person engaging or continuing within the State in any service business or calling not otherwise specifically taxed under this chapter, there is likewise hereby levied and shall be assessed and collected a tax equal to four per cent of the gross income of any such business." There can be no question that MUC is compensated for the services it provides to MIEC and CLIC, and MUC does not assert any other statutory subsection under which it may be taxed. We therefore hold that MUC is subject to a general excise tax at a rate of four percent, pursuant to HRS § 237–13(6).

### 2. The director's motion for reconsideration

██ The director's second and final point of error on appeal asserts that the tax appeal court erred by denying his motion for reconsideration insofar as MUC made factual assertions after the court's oral ruling on MUC's motion for partial summary judgment that raised genuine issues of material fact.

As previously mentioned, it appears that after the tax appeal court's oral ruling, the director prepared a proposed order that included the following pertinent finding of fact: "MUC's gross income subject to the general excise tax for compensation for services rendered as an attorney-in-fact to [MIEC] and [CLIC] for the period January 1992 through January 1999, inclusive, totaled $2,629,301.00." MUC filed objections to that proposed finding of fact, asserting that it

> is inappropriate because said proposed "fact" is erroneous and unsupported by any evidence. That appellee treated appellant's general excise tax assessments, as "admissions against interest" under Rule 803 of the Hawaii Rules of Evidence for the purpose of MUC's motion for partial summary judgment, does not convert the assessments into stipulated facts.
>
> [The director's] proposed finding ... should also be rejected because it is factually incorrect. [The] [f]inding ... erroneously states that appellee received "compensation for services rendered as an attorney-in-fact for ... [CLIC]." In fact, [CLIC] is NOT a reciprocal insurance carrier and therefore did not compensate MUC for services rendered as its attorney-in-fact." [14]

(Some ellipses added and some in original.). The director thereafter filed a motion for reconsideration accusing MUC of misrepresenting facts to the tax appeal court and arguing that more evidentiary proceedings were required to address the genuine issues of material fact created by (1) the revelation that MUC is not the attorney-in-fact for CLIC, and (2) MUC's refusal to stipulate to the $2,629,301.00 amount that served as the basis for calculating its tax liability.

For the following reasons, we agree with the tax appeal court's decision to deny the director's motion for reconsideration. First, the director's characterization of MUC's admission that it is not an attorney-in-fact for CLIC as new evidence is curious given that the director's own pretrial motions characterized MUC as the attorney-in-fact for MIEC and the managing agent of CLIC, thus demonstrating its cognizance of the fact that MUC's relationship with MIEC differed from its relationship with CLIC.[15] Moreover, even if the director was truly not aware that MUC was not an attorney-in-fact of CLIC, such basic information could easily have been obtained prior to such a late stage in the proceedings. Second, the director has waived any argument premised upon MUC's assertion that it did not stipulate to the $2,629,301.00 amount. The record indicates that MUC's motion for partial summary judgment expressly treated the $2,629,301.00 amount as an admission by a party opponent under Hawai'i Rules of Evidence Rule 803(a)(1). Thus, MUC made clear that it did not stipulate to the accuracy of the director's calculation; rather it merely agreed that it would abide by that number and used the number to calculate its tax liability at a rate of .15 percent. The director was sufficiently apprised of MUC's refusal to stipulate at that time. Nevertheless, the director thereafter filed a response that stated, "the Director does not object or oppose the fact that [MUC's] general excise tax liability is $3,943.95 for income received in the amount of $2,629,301.00 as compensation for services rendered as an attorney-in-fact." By failing to object or oppose MUC's position at that time, the director may not, in a motion for reconsideration, challenge MUC's reiteration of that position after the tax appeal court's oral ruling on the matter.

Therefore, the director's present point of error is without merit.

---

14. *See* discussion *supra* at n. 6.

15. Indeed, the director's August 24, 2001 motion for summary judgment described MUC as follows: "[MUC] is the attorney-in fact [sic] of an insurance company, [MIEC]. Taxpayer is also the managing agent of another insurance company, [CLIC] . . . ."

### B. MUC's Cross–Appeal

In its opening brief on cross-appeal, MUC presents the following points of error: (1) the tax appeal court erred by failing to exempt MUC from the payment of general excise taxes pursuant to HRS § 237–29.7 inasmuch as MUC is an insurance company authorized to do business under HRS chapter 431; (2) the tax appeal court improperly denied MUC's motion for leave to file an amended answer to director's notice of appeal, filed on July 6, 2000, and to alter or amend the final judgment filed September 23, 2004; and (3) the tax appeal court improperly denied MUC's motion for attorneys' fees and costs.

Inasmuch as we have already concluded that MUC's first point of error is without merit, only MUC's final two points of error remain.

#### 1. *MUC's Motion for Leave to File an Amended Answer and to Alter or Amend the Judgment*

MUC's second point of error on cross-appeal asserts that the Tax Appeal Court erred by denying MUC's motion for leave to file an amended answer and to alter or amend the judgment. MUC specifically contends that the director introduced evidence relating to MUC's tax liability for the years 1985 to 1991, and that under Hawai'i Rules of Civil Procedure Rule 15(b), the court was required to amend "the pleadings as may be necessary to cause them to conform to the evidence, upon motion of any party at any time." MUC further contends that under HRCP Rule 42, the issue of its tax liability in years 1985–1991 should have been consolidated with the present matter, involving its tax liability for the years 1991–1999, inasmuch as common issues of law and fact arose from both time periods. The director counters that MUC's motion to amend was an attempt to circumnavigate the fact that it failed to timely appeal the Board's adverse ruling with respect to the 1985–1991 time period.

However, in light of the foregoing conclusions that the director properly taxed MUC at a rate of four percent, the issue presented is moot.

#### 2. *MUC's motion for attorneys' fees and costs*

MUC's third point of error on cross-appeal asserts that it is entitled to attorneys' fees and costs incurred in defending against the director's bad faith abuse of power. Specifically, MUC asserts that

> the actions of the [d]irector in unilaterally rewriting more than sixty years of law without precedent and then not only applying his self-written law upon MUC but also applying his self-written law retroactively for nearly fifteen years so that MUC was unable to pay the taxes, penalties, and interest so assessed in full can, at the very least, be described as actions taken in bad faith.

However, MUC's argument is without merit inasmuch as (1) MUC was properly taxed at a rate of four percent, and (2) the director is correct that MUC's failure to file returns authorizes it to assess MUC at any time. *See* HRS § 237–40(b) (1993) ("In the case of . . . a failure to file the annual return, the tax may be assessed or levied at any time. . . ."). Accordingly, MUC has failed to assert a legitimate basis for its bad faith claim.

### IV. CONCLUSION

In sum, the payment of compensation by a reciprocal insurer to its attorney-in-fact is a taxable event under this jurisdiction's insurance code and general excise tax scheme. Additionally, insofar as MUC is not licensed as a general agent, subagent, or solicitor, it is not subject to the .15 percent tax rate imposed by HRS § 237–13(7). Rather, it is subject to the four percent tax rate imposed by HRS § 237–13(6).

Therefore, we partially vacate the tax appeal court's judgment and remand with instructions to enter judgment in favor of the director in the amount of $105,172.04.[16]

---

16. The $105,172.04 amount is derived from ap-

plying a general excise tax rate of four percent to

the $2,629,301.00 received by MUC as compensation for services rendered to MIEC and CLIC. Although the director assessed MUC in the amount of $160,258.45 for the tax years presently at issue, that amount included interest and penalties. The tax appeal court's judgment did not award interest and penalties, *see* discussion *supra* at n. 5, and the director did not appeal that omission. Hence, interest and penalties should not be awarded on remand.