***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCAP-17-0000367
04-MAR-2019
09:14 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

IN THE MATTER OF THE TAX APPEAL OF PRICELINE.COM, INC., ET AL.,
Petitioners/Taxpayers-Appellants-Appellees-Cross-Appellants,

vs.

DIRECTOR OF TAXATION, STATE OF HAWAI'I,
Petitioner/Appellee-Appellant-Cross-Appellee.

SCAP-17-0000367

APPEAL FROM THE TAX APPEAL COURT
(T.X. NO. 13-1-0269 AND CONSOLIDATED CASES:
13-1-0261 through 13-1-0270, 14-1-0001 through 14-1-0010,
and 14-1-0243 through 14-1-0251)

MARCH 4, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case is a consolidated appeal from twenty-nine General Excise Tax assessments levied by the Director of Taxation of the State of Hawai'i against five online travel companies based on car rental transactions that took place in Hawai'i between January 1, 2000, and December 31, 2013. The

online travel companies contend that the majority of the assessments are barred because they have already litigated their General Excise Tax liability for the years in question to final judgment in a previous case.  They further argue that the rental car transactions should qualify for a reduced General Excise Tax rate that is calculated based only on the portion of the proceeds that they retain because rental cars are "tourism related services" within the meaning of a statutory income-reducing provision.  The Director of Taxation of the State of Hawaiʻi responds that the State cannot be estopped from collecting taxes it is legally owed based on a previous litigation and that the rental car transactions must be taxed at the full rate because no income-reducing provision applies.

We hold on review that, because our precedent does not permit the actions of a specific government official to impede the fundamental sovereign power of taxation, the assessments are not barred and may be considered on the merits.  We further hold that rental cars are tourism related services and the assessed transactions qualify for the reduced General Excise Tax rate based only on the portion of the proceeds that the online travel companies retained.

## I.    BACKGROUND

### A.    The OTCs' Business Model

The taxpayers in this case are five online travel companies[1] (the "OTCs") that provide services similar to those of a traditional travel agent through their respective public websites.[2]  The OTCs maintain databases of up-to-date information about travel-related services offered by third-party providers, including airline flights and car and hotel rentals.  Travelers accessing the websites can view availability and price data for services associated with a destination and make reservations through the OTCs rather than contacting service providers directly.  The OTCs negotiate and contract with service providers to secure reduced pricing in exchange for providing

---

[1]    The parties to this appeal and cross-appeal include Priceline.com, Inc. (n/k/a The Priceline Group, Inc.); Expedia, Inc.; Hotwire, Inc.; Orbitz, LLC; and Trip Network, Inc. (d/b/a Cheaptickets.com). Before the tax court, the consolidated tax appeal also included Hotels.com, L.P.; Internetwork Publishing Corp. (d/b/a Lodging.com); Travelweb LLC; Travelocity.com LP (n/k/a TVL LP); and Site59.com, LLC.  The tax assessments levied against Travelocity.com LP (n/k/a TVL LP) and Site59.com, LLC were resolved out of court, and the appeal was dismissed with prejudice by stipulation on November 29, 2016.  The tax court entered judgment in favor of Hotels.com, L.P.; Internetwork Publishing Corp. (d/b/a Lodging.com); and Travelweb LLC in the stipulated final judgment filed April 25, 2017, and no party has appealed this portion of the ruling.

No OTC that was a party to any stage of the proceedings in this case was headquartered or had a principal place of business in the State of Hawai‘i.

[2]    Some of the OTCs also operate call centers and process transactions over the telephone using a substantially identical business model.

global marketing and supplying a mechanism for connecting customers with excess inventory.

In the transactions at issue in this case, the OTCs utilized a business method called the "merchant model."[3] In a merchant model transaction, a customer makes a single payment to an OTC for all purchased services at the time of the reservation--typically as a credit card charge processed through the OTC's website. The OTC appears as the merchant of record for the credit card transaction. This payment--called the "gross income" or "gross receipts"--includes at least two components: the base price for services set by contract between the OTCs and service providers,[4] which the OTCs remit to the service providers, and an amount that the OTCs retain as compensation for facilitating the transaction.[5] See Hawaii

---

[3] The OTCs also employ the "agency" or "retail" model of transaction, in which customers make reservations through the OTCs' websites and make payment directly to the service provider at the time of service. The service provider then forwards a portion of the proceeds to the OTC as a commission for facilitating the transaction. The Director of Taxation of the State of Hawai'i has issued separate tax assessments to the OTCs based on their agency-model transactions in the tax years at issue in this case, but the OTCs are not challenging these assessments in this appeal.

[4] The briefs refer to this base price of the service as the "net rate." Because "net" may alternatively refer to the amount the OTCs retain after all expenses, see Net, Black's Law Dictionary (10th ed. 2014), this opinion instead uses the term "base rate."

[5] The briefs alternatively refer to this amount as a "service fee," "facilitation fee," "mark-up," and "margin," and sometimes characterize it as representing separate charges for facilitating the initial transaction and for providing ongoing customer service related to the reservation. Any distinction in the compensation retained by the OTCs is not relevant to this appeal, and this Opinion refers to the full amount collectively.

Revised Statutes (HRS) § 237-3 (2017) (defining "gross income").

Some of the transactions at issue in this case also included a

"tax recovery" charge representing the estimated amount of taxes

the service providers would pay on the transaction, which the

OTCs also forwarded to the service providers.[6]  No component of

the gross income is explicitly designated to satisfy the OTCs'

own tax obligations.

The OTCs do not disclose the total amount of gross

income collected in each transaction to service providers and do

not inform customers of the separate cost of each component of

the payment.  Consequently, only the OTCs know how much money

they retain in each merchant model transaction.

With respect to vehicle rentals, merchant model

transactions are further divided into package and stand-alone

transactions.  In package transactions, customers purchase

multiple travel-related services simultaneously through the OTCs

for a single payment.  A customer may reserve an airline ticket

or hotel room at the same time as a rental vehicle, for

instance.  The OTCs separate the base rate for each included

service and forward that amount to the appropriate service

provider.  A stand-alone transaction, by contrast, involves only

---

[6]     In those transactions that did not include a tax recovery fee,
customers typically paid applicable taxes, fees, and surcharges directly to
the service provider at the time of the service.

a rental vehicle reservation from a single service provider.
All of the OTCs engaged in package transactions during the years
at issue in this case, but only Priceline.com, Inc. and Hotwire,
Inc. also offered stand-alone car rentals as a standard business
practice.[7]

### B.    The 2015 Travelocity Case

Prior to 2011, the OTCs filed no tax returns with and
paid no taxes to the State of Hawai'i on merchant-model
transactions that resulted in the purchase of services rendered
within the State.  See Travelocity.com, L.P. v. Dir. of
Taxation, 135 Hawai'i 88, 95-96, 346 P.3d 157, 164-65 (2015).  In
2011 and 2012, the Director of Taxation of the State of Hawai'i
(the Director) issued two sets of "Notice[s] of Final Assessment
of Additional General Excise And/Or Use Tax" to each OTC.[8]  See
id. at 93, 346 P.3d at 162.  The Director retroactively assessed
the OTCs for unpaid General Excise Tax (GET)[9] on the gross income

---

[7]    Although a majority of the OTCs generally do not offer stand-alone car rentals, the evidence indicates that stand-alone transactions accounted for approximately two-thirds of bookings in all assessed merchant car rentals by revenue and volume.

[8]    The final assessment represents the culmination of an administrative procedure in which a taxpayer is first informed of a proposed assessment and given an opportunity to file an administrative protest before the assessment is finalized.  See generally Matter of Simpson Manor, Inc., 57 Haw. 1, 7, 548 P.2d 246, 250 (1976) (describing the procedure as it relates to due process).

[9]    As discussed in greater detail below, the GET is a tax assessed "based on the privilege or activity of doing business within the State and

(continued . . .)

from transactions from 1999 to 2011 that resulted in hotel room rentals within the State of Hawai'i, as well as interest and penalties for failing to file and non-payment.[10]  Id. at 92, 346 P.3d at 161.

The OTCs appealed the assessments to the tax court, arguing, inter alia, that they were not subject to GET because their business activities did not take place in Hawai'i as the authorizing statute required.  Id. at 98-99, 116, 346 P.3d at 168-69, 185 (citing HRS § 237-13 (Supp. 1999)[11]).  On August 15,

_____

(. . . continued)

not on the fact of domicile."  Travelocity, 135 Hawai'i at 103, 346 P.3d at 172 (quoting Matter of Grayco Land Escrow, Ltd., 57 Haw. 436, 447, 559 P.2d 264, 272 (1977)).  It is imposed on gross income derived from, inter alia, "any service business" within the State that is not exempted or otherwise provided for in the authorizing statute.  Id. at 97, 346 P.3d at 166 (quoting HRS § 237-13 (Supp. 1999)).  The "inherent pervasiveness" of the tax is mitigated by a number of income-reducing provisions specifying that certain classes of transactions are untaxed or taxed on a value less than the gross income derived from the transaction.  Id. at 106, 346 P.3d at 175 (quoting Matter of Tax Appeal of Cent. Union Church--Arcadia Ret. Residence, 63 Haw. 199, 202, 624 P.2d 1346, 1349 (1981)).

[10]    The Director also assessed Travel Accommodations Tax (TAT) and associated interest and penalties on the transactions.  Travelocity, 135 Hawai'i at 93, 346 P.3d at 162.  The TAT is a tax imposed on the gross rental proceeds derived by "operators" of short-term "transient accommodations" including hotels.  Id. at 119-20, 346 P.3d at 188-89 (citing HRS § 237-2 (Supp. 1998)).  The OTCs appealed the assessments, and the tax court found that the OTCs were not "operators" subject to TAT under the authorizing statute.  Id. at 127, 346 P.3d at 196.  On review, this court agreed.  Id.

[11]    HRS § 237-13 provides in relevant part:

    There is hereby levied and shall be assessed and collected
    annually privilege taxes against persons on account of
    their business and other activities in the State measured
    by the application of rates against values of products,
    gross proceeds of sales, or gross income, whichever is
    specified, as follows:

(continued . . .)

2013, the tax court entered final judgment finding the OTCs liable for the full amount of the assessed GET.  Id. at 92, 346 P.3d at 161.  The Director and OTCs filed cross appeals, and this court granted transfer.  Order, Travelocity.com, LP v. Dir. of Taxation, No. SCAP-13-0002896, 2013 WL 6822079 (Haw. Dec. 24, 2013).

On March 17, 2015, this court issued an opinion affirming in part and vacating in part the tax court's final judgment.  Travelocity, 135 Hawai'i at 127, 346 P.3d at 196.  The court first determined that the OTCs' merchant hotel room transactions constituted "sufficient 'business and other activities in the State' to impose the GET" because the OTCs actively solicited and contracted with Hawai'i hotels and Hawai'i consumers to profit from the sale of occupancy rights that were wholly exercised in Hawai'i.  Id. at 105, 346 P.3d at 174 (quoting HRS § 237-13).

---

(. . . continued)

. . . .

(6) Tax on service business.

(A) Upon every person engaging or continuing within the State in any service business or calling including professional services not otherwise specifically taxed under this chapter, there is likewise hereby levied and shall be assessed and collected a tax equal to four per cent of the gross income of the business . . . .

The court went on to hold, however, that the assessed transactions qualified for GET apportionment under a related statutory provision because the rented hotel rooms were "transient accommodations . . . furnished through arrangements made by a travel agency . . . at noncommissioned negotiated contract rates" for which the "gross income [was] divided between the operator of transient accommodations . . . and the travel agency." Id. at 106, 113, 346 P.3d at 175, 182 (quoting HRS § 237-18(g) (1993) (emphasis omitted)).[12] Accordingly, the court held that the OTCs were liable for GET and associated interest and penalties based on only the amounts they retained from the assessed transactions and not the gross income. Id. at 113, 346 P.3d at 182.

The court therefore remanded the case to the tax court to make a final determination of each OTC's GET liability under the ruling. Id. at 127, 346 P.3d at 196. The tax court entered

_____

[12] HRS § 237-18(g) provides in full:

Where transient accommodations are furnished through arrangements made by a travel agency or tour packager at noncommissioned negotiated contract rates and the gross income is divided between the operator of transient accommodations on the one hand and the travel agency or tour packager on the other hand, the tax imposed by this chapter shall apply to each such person with respect to such person's respective portion of the proceeds, and no more.

a set of Stipulated Final Judgments on Remand on September 21, 2015, establishing each OTC's GET liability.

### C.    The Present Case

On December 9, 2013, while the cross-appeals of the tax court's initial judgment in Travelocity were pending, the Director issued a new set of "Notice[s] of Final Assessment of Additional General Excise And/Or Use Tax" based on the gross income from the OTCs' merchant rental car transactions from 2000 to 2012.[13]  This was followed on July 18, 2014, by an additional set of GET assessments based on the gross income from the OTCs' 2013 merchant rental car transactions.[14]

### 1.    The Tax Court Proceedings

Upon receiving the merchant rental car GET assessments, the OTCs filed timely notices of appeal to the tax court.  The appeals were consolidated, and prior to trial the Director and OTCs filed cross-motions for partial summary judgment.

---

[13]    The OTCs filed timely administrative protests for all of the assessments at issue in this case.

[14]    The 2013 assessments also included GET and TAT on the OTCs' merchant hotel room rental transactions.  Following this court's decision in Travelocity, 135 Hawaiʻi at 127, 346 P.3d at 196, the TAT assessments were canceled by stipulation.  The 2013 merchant hotel room rentals' GET assessments are also not at issue in this appeal.

### a.    The Director's Motion for Partial Summary Judgment

On May 9, 2016, the Director filed a motion seeking a ruling that the OTCs were liable for GET on the gross income from all merchant rental car transactions in the State of Hawai'i from 2000 to 2013, as well as interest and penalties for failing to file and non-payment.  The Director first contended that, under our precedents, the assessment of taxes, penalties, and interest are presumed correct, making it the OTCs' burden to disprove the accuracy of the challenged assessments.  (Citing Travelocity, 135 Hawai'i at 114-15, 346 P.3d at 183-84.)  The Director then argued that Travelocity was dispositive as to the GET's applicability to the OTCs' merchant rental car transactions because the rentals constituted business and other activities in Hawai'i under HRS § 237-13 in the same manner as the OTCs' merchant hotel room rentals.  (Citing 135 Hawai'i at 103-05, 346 P.3d at 172-74.)

Anticipating the OTCs' counter-argument based on their earlier administrative protests, the Director asserted that no income-reducing provision applied to the merchant rental car transactions.  Specifically, the Director argued that "the income-reducing provision in HRS § 237-18(f)[15] that applies to

---

[15]    HRS § 237-18(f) provides in full as follows:

(continued . . .)

'tourism related services' simply does not encompass" the merchant rental car transactions based on legislative history and principles of statutory construction.

Lastly, the Director argued that the OTCs are subject to penalties under HRS § 231-39(b)[16] for their undisputed failure

_____

(. . . continued)

> Where tourism related services are furnished through arrangements made by a travel agency or tour packager and the gross income is divided between the provider of the services and the travel agency or tour packager, the tax imposed by this chapter shall apply to each such person with respect to such person's respective portion of the proceeds, and no more.
>
> As used in this subsection "tourism related services" means catamaran cruises, canoe rides, dinner cruises, lei greetings, transportation included in a tour package, sightseeing tours not subject to chapter 239, admissions to luaus, dinner shows, extravaganzas, cultural and educational facilities, and other services rendered directly to the customer or tourist, but only if the providers of the services other than air transportation are subject to a four per cent tax under this chapter or chapter 239.

[16]   HRS § 231-39(b) (2017) provides in relevant part as follows:

> (b) There shall be added to and become a part of the tax imposed by such tax or revenue law, and collected as such:
>
>> (1) Failure to file tax return.  In case of failure to file any tax return required to be filed on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that the failure is due to reasonable cause and not due to neglect, there shall be added to the amount required to be shown as tax on the return five per cent of the amount of the tax if the failure is for not more than one month, with an additional five per cent for each additional month or fraction thereof during which the failure continues, not exceeding twenty-five per cent in the aggregate. . . .
>
>> (2) Failure to pay tax.

(continued . . .)

to file returns or pay GET on their merchant rental car transactions because they had not demonstrated the failure was "due to reasonable cause and not due to neglect." (Citing Travelocity, 135 Hawai'i at 113, 346 P.3d at 182.)

On July 26, 2016, the OTCs filed an opposition to the Director's motion for partial summary judgment. Directing the court to their own cross-motion for partial summary judgment, discussed below, the OTCs argued that the assessments for tax years 2000 to 2011 were barred under the doctrine of res judicata due to GET liability for those years having been litigated to final judgment in Travelocity.

The OTCs then contended that the Director had misapprehended this court's statements in Travelocity about the presumption of a tax assessment's correctness; only the calculation of the amount of tax owed is presumed correct, the OTCs asserted, and questions of law regarding application of a tax are reviewed de novo. (Citing 135 Hawai'i at 114, 346 P.3d at 183.) The OTCs pointed out that our precedents indicate tax

---

(. . . continued)

> (A) If any part of any underpayment is due to negligence or intentional disregard of rules (but without intent to defraud), there shall be added to the tax an amount up to twenty-five per cent of the underpayment as determined by the director.

statutes should be interpreted strictly with ambiguity resolved in favor of the taxpayer. (Citing In re Fasi, 63 Haw. 624, 629, 634 P.2d 98, 103 (1981).)

The OTCs then argued that the assessments should be vacated because they failed to apply the GET apportioning provision for "tourism related services" under HRS § 237-18(f). The OTCs asserted that vehicle rentals fall squarely within the conventional conception of tourism related services and disputed the Director's interpretation of legislative history and application of statutory construction principles. Lastly, the OTCs argued that genuine issues of material fact existed as to which OTCs filed or paid GET during the years in question, and the determination of penalties should therefore be deferred until after the resolution of the partial summary judgment motions.

**b.   The OTCs' Cross-Motion for Partial Summary Judgment**

On July 7, 2016, the OTCs filed a motion seeking a judgment that the GET assessments covering 2000 through 2011 were barred by res judicata because the Director had previously assessed and litigated the OTCs' GET liability for those years to final judgment in Travelocity.[17] Relying on a range of

---

[17]   The OTCs also contended that the assessments should be vacated for failing to apply GET apportionment, utilizing arguments substantially

(continued . . .)

federal cases, the OTCs argued that established "hornbook principles" of law make clear that a taxpayer's liability for a single type of tax during a single tax year gives rise to a single cause of action.  The OTCs contended the doctrine of res judicata should therefore bar all claims or defenses that were brought or could have been brought in the previous proceeding to establish their GET liability.

The OTCs further argued that the Director was aware of and could have included the merchant car rental transactions in the first action, pointing to the assessed hotel room transactions in Travelocity that also included a car rental as part of the purchased package.  Public policy also weighed in favor of applying res judicata, the OTCs concluded, because the doctrine serves to promote finality, relieve parties of the cost of multiple lawsuits, conserve judicial resources, and encourage reliance by preventing inconsistent decisions.

On July 26, 2016, the Director filed an opposition to the OTCs' cross-motion for partial summary judgment.  The Director argued that the OTCs' res judicata argument fails because the OTCs did not file GET returns and Hawai'i tax

_____

(. . . continued)

identical to those included in the OTCs' opposition to the Director's motion for partial summary judgment.

statutes treat non-filers in "a different and more punitive manner than taxpayers who file returns." Applying res judicata would encourage tax fraud, the Director continued, by requiring the Director to guess what undisclosed business activities a non-filer has conducted in Hawai'i. The Director further pointed out that article VII, section 1 of the Hawai'i Constitution prohibits the surrender or suspension of the taxing power, and that this court has held that estoppel defenses do not apply to the fundamental sovereign power of taxation. (Citing Dir. Of Taxation v. Med. Underwriters of Cal., 115 Hawai'i 180, 194, 166 P.3d 353, 367 (2007).)

Additionally, the Director asserted that no Hawai'i court had ever recognized res judicata as a defense to taxation and that the OTCs had not met the technical requirements of the doctrine as applied by Hawai'i courts in any event. Lastly, the Director argued that even if res judicata was an available defense under the circumstances, summary judgment was inappropriate because genuine issues of material fact existed as to whether the Director knew about the OTCs' merchant rental car transactions at the time of Travelocity and thus could have included them in the prior proceeding.

The Director's opposition also included a number of additional arguments that the merchant rental car transactions

did not qualify as "tourism related services" for GET apportionment under HRS § 237-18(f).  Most notably, the Director contended that certain types of rental car transactions could not be characterized as tourism related services under any definition of the term, including rentals to Hawaiʻi residents whose vehicles have broken down or to business persons traveling to the State or among the islands for only business purposes.

### c.  Hearing and the Tax Court's Ruling

The tax court held a joint hearing on the cross-motions on August 5, 2016.  At the hearing, the tax court expressed "legitimate concern about how many times the taxpayers are going to have to come back to . . . defend general excise tax issues" and stated that "there's very little dispute that people in the world, including the tax director in Hawaii, knew that car rental services were part of the services that these online travel companies offered" prior to Travelocity.  The court found, however, that this did not equate to knowledge of "actionable conduct" by the OTCs on which additional GET could be assessed.  Because Travelocity and the present case were initiated through separate assessments based on "completely different activity giving rise to the alleged tax liability," the court found that the present action was not barred by res judicata.

Turning to whether the HRS § 237-18(f) apportioning provision applied, the court found that the primary commonality among the ten enumerated examples of tourism related services in the statute was that they were part of tour packages. Citing this court's discussion of the term "tour packager" in Travelocity, the court asserted that the legislature's inclusion of "transportation included in a tour package" rather than simply "transportation" confirmed that the provision was intended to reach only services packaged together for resale by a travel agent. Accordingly, the court found that the stand-alone merchant rental car transactions did not qualify as tourism related services for GET apportionment under HRS § 237-18(f). The court further found that package transactions, however, in which the rental car was purchased along with at least one other service, qualified as "transportation included in a tour package" and were thus tourism related services within the meaning of the GET apportionment provision.

On November 4, 2016, the court entered an order corresponding with its oral rulings granting in part and denying in part the Director and OTCs' cross-motions for partial summary judgment.[18] On April 25, 2017, the tax court entered a

_____

[18] The order included failure-to-file penalties against all OTCs for tax years 2000 through 2012, as well as failure-to-pay penalties against all

(continued . . .)

Stipulated Order and Final Judgment Disposing of All Issues and Claims of All Parties.  Both the Director and the OTCs timely appealed.  Prior to briefing, the Director and the OTCs each filed applications for transfer to this court.  This court granted transfer on August 11, 2017.

### 2.   Proceedings Before this Court

Before this court, the Director argues that the tax court erred by applying the HRS § 237-18(f) GET apportioning provision to the OTC's package rental car transactions.  The Director contends that, by determining that rental cars included in package transactions were "transportation within a tour package," the court disregarded the plain language of the law by changing the term "transportation" to "rental cars" and ignoring the word "tour."

The Director further asserts that the legislative history of HRS § 237-18(f) and other taxing provisions indicates that the legislature intended only those services in which a tourist is conveyed to a second location by another party to be included in the term "transportation," and that this meaning is reflected by standard rules of statutory construction and in the

---

(. . . continued)

OTCs for tax years 2000 through 2013 except for priceline.com for the period from May 2013 through December 2013.

various portions of the Hawaiʻi Administrative Rules that employ the term. And, even were rental cars "transportation" for purposes of HRS § 237-18(f), the Director contends, the OTCs failed to demonstrate that rental cars are included in a "tour" package. The Director argues that the OTCs submitted no evidence detailing the components included in the specific assessed transactions, and thus there is no evidence in the record to create a genuine issue of material fact as to whether the transactions constituted "tour" packages.[19] An evidentiary presumption in favor of the correctness of the Director's tax assessments therefore should have been determinative, the Director contends, regardless of whether the inclusion of airfare or accommodations would qualify a transaction as a tour package.

The OTCs in turn argue that the tax court erred by failing to find that principles of res judicata bar the Director from collecting additional assessments of a tax for tax years that have been previously litigated to final judgment. And even if these assessments are not wholly barred, the OTCs maintain,

_____

[19] The Director's own submitted evidence included documentation from which it can be reasonably inferred that the assessed transactions included package transactions with accommodations or airfare as a component, including a declaration by a consultant hired by the DOT indicating such package transactions accounted for approximately one-third of the assessed transactions by volume and revenue.

the tax court's ruling cannot stand because it failed to apply the HRS § 237-18(f) income-apportioning provision to the OTCs stand-alone merchant car rental transactions, which legislative history and principles of statutory construction confirm are "tourism related services" within the meaning of the statute.

## II.     STANDARD OF REVIEW

This court reviews the grant or denial of summary judgment de novo.  Travelocity.com, L.P. v. Dir. of Taxation, 135 Hawai'i 88, 96-97, 346 P.3d 157, 165-66 (2015).  "When the facts are undisputed and the sole question is one of law, the decision of the [tax court] is reviewed 'under the right/wrong standard.'"  Id. at 97, 436 P.3d at 166 (quoting Kamikawa v. United Parcel Serv., Inc., 88 Hawai'i 336, 338, 966 P.2d 648, 650 (1998)).

## III.     DISCUSSION

In reviewing the tax court's grant or denial of summary judgment, this court applies the same standard as the trial court: "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Travelocity.com, L.P. v. Dir. of Taxation, 135 Hawai'i 88, 96-97, 346 P.3d 157,

165-66 (2015) (quoting Fujimoto v. Au, 95 Hawai'i 116, 136, 19 P.3d 699, 719 (2001)).  When performing this evaluation, we consider the evidence in the light most favorable to the non-moving party.  Umberger v. Dep't of Land & Nat. Res., 140 Hawai'i 500, 528, 403 P.3d 277, 305 (2017) (quoting Lambert v. Waha, 137 Hawai'i 423, 432 n.9, 375 P.3d 202, 211 n.9 (2016)).

In this case, the OTCs argue that the Director was barred by res judicata from bringing an action to enforce any additional GET assessments based on years for which the OTCs' GET liability was litigated to final judgement in Travelocity. The Director responds that as an estoppel defense, res judicata is not available as a defense against the sovereign power of taxation.  We therefore first examine the development of the doctrine of res judicata, relevant statutory law, and our precedent concerning the application of estoppel defenses in this context.  We then turn to the statutes governing the GET and examine their plain text, legislative history, and applicable canons of statutory construction to determine whether rental car transactions qualify as "tourism related services" for purposes of the relevant income-reducing provision.

### A.  Res Judicata

### 1.  Overview

The OTCs argue that the Director is barred from assessing them additional GET for the years 2000-2011[20] by res judicata because their GET liability for those years was litigated to final judgment in Travelocity.  The Corpus Juris Secundum defines res judicata as the doctrine that "treats the final determination of an action as speaking the infallible truth as to the rights of the parties as to the entire subject of the controversy, so that such controversy and every part of it must stand irrevocably closed by such determination."  50 C.J.S. Judgments § 926 (2018).  This common law doctrine has its roots in the Roman and Germanic legal systems that contributed to Anglo-American law, and similar rules give preclusive effect to final judgments in most contemporary legal systems. Developments in the Law-Res Judicata, 65 Harv. L. Rev. 818, 820 (1952).

As recognized in this court's early decisions, the doctrine was historically considered to have two interrelated aspects, each arising from the litigation of a matter to final

---

[20]     The GET assessments in this case also include rental car transactions in the years 2012 and 2013, years which were not included in the Travelocity assessments and thus not covered by the OTCs' res judicata defense.  See supra, notes 13, 14, and accompanying text.

judgment: one barring the bringing of a new action between the parties based on the same subject matter as a previous claim, and one barring the relitigation of specific issues previously determined in a case between the same parties.

> Res judicata is twofold. The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided. Likewise, the adjudication by a court of competent jurisdiction of any right, fact or issue arising between the parties and actually litigated by them bars the relitigation between the same parties or their privies in any court of the same right, fact or issue arising in any subsequent action or suit between the same parties or their privies, and this irrespective of whether the later action or suit relates to the same subject matter.

In re Bishop, 36 Haw. 403, 416–17 (Haw. Terr. 1943) (citing Makainai v. Lalakea, 29 Haw. 482 (Haw. Terr. 1926)). Thus, res judicata as originally articulated by this court prohibited the assertion of any grounds of claim or defense that was or could have been asserted in a prior litigation between the parties in a later litigation concerning the same subject matter. This concept was historically called "estoppel by judgment," and is modernly termed "claim preclusion," "true res judicata," or simply "res judicata."[21] See E. A. K., Judgments-Distinction

---

[21] Some formulations further divide claim preclusion into the concepts of "merger," "bar," and "splitting." See Restatement (Second) of Judgments § 24 (1982). Merger prevents a plaintiff from asserting a new action on a "claim or any part thereof" when a "final personal judgment" has been rendered in the plaintiff's favor on that claim. Id. at § 18(1). Bar

(continued . . .)

Between Res Judicata and Estoppel by Verdict, 7 Tex. L. Rev. 167, 168 (1928); 46 Am. Jur. 2d Judgments § 443 (2018). The doctrine further prohibited the relitigation of specific issues that were actually decided in a prior litigation against a party--regardless of the subject matter of the subsequent litigation. This is known as "estoppel by verdict," "collateral estoppel," "partial res judicata," or, in modern times, "issue preclusion." E. A. K., supra, at 168; 46 Am. Jur. 2d Judgments § 443; Hemmings v. C.I.R., 104 T.C. 221, 231 (1995).

Although some academics still refer to both concepts as falling "[w]ithin the general doctrine of res judicata," 46 Am. Jur. 2d Judgments § 443, this court has largely adopted the modern view that "[r]es judicata, or claim preclusion, and collateral estoppel, or issue preclusion, are . . . . separate doctrines that 'involve[] distinct questions of law.'"[22] Bremer v. Weeks, 104 Hawai'i 43, 53 & n.14, 85 P.3d 150, 160 & n.14 (2004) (quoting Dorrance v. Lee, 90 Hawai'i 143, 148, 976 P.2d 904, 909 (1999)).

---

(. . . continued)

prevents a plaintiff from bringing another action on a claim on which the plaintiff has previously lost. Id. at § 19. Splitting is the rule that multiple claims from a "series of connected transactions" may not be brought in separate actions. Id. at § 24.

[22]    The OTCs argue only that the assessments in this case are barred by the first concept, claim preclusion. This opinion therefore addresses issue preclusion only when relevant to its analysis of claim preclusion.

Under modern formulations, the party asserting claim preclusion has the burden of proving three elements to establish that an action is barred: 1) there was a final judgment on the merits, 2) both parties are the same or are in privity with the same parties in the original suit, and 3) the claim decided in the original suit is identical with the one presented in the action in question. E. Sav. Bank, FSB v. Esteban, 129 Hawai‘i 154, 159, 296 P.3d 1062, 1067 (2013) (quoting Bremer, 104 Hawai‘i at 54, 85 P.3d at 161). Some courts alternatively phrase the third element as "the same cause of action must be involved in both cases" and explicitly add a fourth requirement: that the first judgment was rendered by a court of competent jurisdiction. See Batchelor-Robjohns v. United States, 788 F.3d 1280, 1285 (11th Cir. 2015).

All but one of the elements are undisputed in this case; the Director does not contest that there was a final judgment on the merits by a court of competent jurisdiction in Travelocity, nor that the case involved the same parties as the present suit. Rather, the Director argues that as a matter of law res judicata is not available as a defense in an action by the State to collect GET.[23]

---

[23]     Given our disposition of this issue, we need not address whether the OTCs' GET liability on the merchant rental car transactions constitutes

(continued . . .)

## 2.    The Statutory Framework

As an initial matter, res judicata is a common law doctrine, and common law may generally be overridden by statute.[24]  See In re Water Use Permit Applications, 94 Hawaiʻi 97, 120, 9 P.3d 409, 432 (2000) (holding the legislature may override common law doctrine "as it deems appropriate or necessary"); cf. Gold Coast Neighborhood Ass'n v. State, 140 Hawaiʻi 437, 451, 403 P.3d 214, 228 (2017) ("However, statutes which abrogate the common law must do so expressly, not impliedly, and such statutes 'must be strictly construed.'" (quoting Burns Int'l Sec. Servs., Inc. v. Dep't of Transp., 66 Haw. 607, 611, 671 P.2d 446, 449 (1983))).  Indeed, many federal courts have reasoned that the federal internal revenue code has displaced the common law rules of claim preclusion when holding that a claim by the federal government for a tax deficiency is not barred by a final judgment in a taxpayer's previous refund action based on the same tax year.  Hemmings v. C.I.R., 104 T.C.

_____

(. . . continued)

the same claim litigated in Travelocity or whether the Director as a factual matter could have pursued the OTCs' GET liability for the merchant rental car transactions in Travelocity.

[24]    There may be exceptions to the legislature's ability to override the doctrine of res judicata when to do so would violate the separation of powers by "unconstitutionally interfer[ing] with the judiciary's authority to manage the judicial process and th[e] court's ability to finally resolve matters on appeal by precluding subsequent and repetitive efforts to relitigate the same claims." Berkson v. LePome, 126 Nev. 492, 495 (2010).

221, 235 (1995) (citing, <u>inter alia</u>, <u>Pfeiffer Co. v. United States</u>, 518 F.2d 124, 130 (8th Cir. 1975); <u>Caleshu v. United States</u>, 570 F.2d 711, 713–14 (8th Cir. 1978); <u>Pension Benefit Guaranty Corp. v. Alloytek, Inc.</u>, 924 F.2d 620, 626 (6th Cir. 1991)).[25]

The Director contends that two Hawai'i statutes are relevant to this appeal. First, HRS § 237-40 (2017) provides general guidelines for when the Director may issue a GET assessment. When a taxpayer files a return, the Director may issue an assessment "within three years after the annual return was filed, or within three years of the due date prescribed for the filing of the return, whichever is later." HRS § 237-40(a). When a taxpayer has failed to file a return, however, GET "may be assessed or levied at any time." HRS § 237-40(b). The Director then points to HRS § 237-38 (2017), which further addresses the failure to file a return: "If any person fails,

---

[25] In analyzing whether the action was barred by <u>res judicata</u>, <u>Hemmings</u> considered whether the government's deficiency claim was a compulsory counterclaim under Federal Rules of Civil Procedure (FRCP) Rule 13(a) (2009), which is substantially identical to Hawai'i Rules of Civil Procedure Rule 13(a) (2000). The rule requires that a defendant assert in a responsive pleading "any claim that--at the time of its service--the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." FRCP Rule 13(a). Compulsory counterclaim rules incorporate common law principles of <u>res judicata</u>. <u>Tyler v. DH Capital Mgmt., Inc.</u>, 736 F.3d 455, 460 (6th Cir. 2013). Accordingly, the "classification of compulsory counterclaims is often determinative of pleas of res judicata." <u>Cleckner v. Republic Van & Storage Co.</u>, 556 F.2d 766, 769 (5th Cir. 1977) (citing <u>Aerojet-General Corp. v. Askew</u>, 511 F.2d 710, 717 (5th Cir. 1975)).

neglects, or refuses to make a return, the department of taxation may proceed as it deems best to obtain information on which to base the assessment of the tax.  After procuring the information the department shall proceed to assess the tax."

Although the Director argues that these provisions grant her wide latitude to assess GET in the manner of her choice because the OTCs did not file GET returns for the years in question, neither statute speaks directly to the Director's authority to issue multiple assessments for the same tax.  HRS § 237-40's statement that "the tax may be levied or assessed at any time" is at most ambiguous on the point; an authorization to issue a single assessment at any time is not equivalent to an authorization to issue multiple assessments.  And, contrary to the Director's characterization, HRS § 237-38 does not authorize her to proceed as she deems best generally, but rather only in "obtain[ing] information on which to base the assessment of the tax."

In comparison, the federal statutes that courts have interpreted as displacing aspects of res judicata in federal tax cases speak directly on the government's discretion in filing a deficiency counterclaim.  See 26 U.S.C. § 7422 (2012) ("[T]he United States may counterclaim in the taxpayer's suit." (emphasis added)); Patzkowski v. United States, 576 F.2d 134, 136 n.1 (8th Cir. 1978) ("When a taxpayer has sued for a refund,

29

the Government may, of course, assert its collection action as a counterclaim; alternatively, however, it may file a separate collection action."). And in some cases these courts have also found structural indications that the normal preclusion rules would undermine the federal statutory scheme more generally by, for example, allowing a taxpayer to unilaterally shorten the statute of limitations on the government's deficiency claim by bringing an action for a refund based on the same tax year. See Pfeiffer, 518 F.2d at 129.

In the absence of such a clear pronouncement from the legislature or an obviously incompatible statutory scheme, this court will not infer an intention to override the normal functioning of res judicata from the statutes governing GET assessments. See Gold Coast, 140 Hawaiʻi at 457, 403 P.3d at 234 ("Abrogation of such a deeply-rooted principle of law is contradictory to our jurisdiction's requirement that the common law governs unless 'otherwise expressly provided.'" (quoting HRS § 1-1 (2009)).

3. **Res Judicata, Estoppel, and the Sovereign Taxation Power**

The Director argues that res judicata is a form of estoppel and that estoppel defenses do not apply to the fundamental sovereign tax power under this court's decision in

Director of Taxation v. Medical Underwriters of California, 115 Hawaiʻi 180, 193-94, 166 P.3d 353, 366-67 (2007).[26]  In Medical Underwriters, this court considered whether Medical Underwriters of California (MUC) could assert the defense of equitable estoppel in a tax appeal.  Id.  In the years prior to the case, the insurance division of the State of Hawaiʻi's Department of Commerce and Consumer Affairs had treated MUC as an insurance company for licensing purposes under the state insurance code. Id. at 183, 166 P.3d at 356.  Relying on this classification, MUC reasoned that it was exempt from GET under HRS § 237-29.7 (2001), which specifically excludes "insurance companies authorized to do business under" the insurance code.  Id.

---

[26]    The Director also argues that the fundamental sovereign right of taxation is protected by article VII, section 1 of the Hawaiʻi Constitution, which is entitled "Taxing Power Inalienable" and provides that "[t]he power of taxation shall never be surrendered, suspended or contracted away." Courts interpreting similar provisions have generally held that such provisions bar the State from surrendering the power of taxation through a promise, contract, or transaction.  See Sheehy v. Pub. Emps. Ret. Div., 864 P.2d 762, 766 (Mont. 1993) ("Article VIII, Section 2 of the 1972 Constitution [] prohibits the state from surrendering or contracting away the power to tax.  Under that constitutional provision, the state cannot promise any group of taxpayers that it will never tax them."); Nw. Nat. Life Ins. Co. v. Jordan, 447 F. Supp. 856, 861 (D. Nev. 1978) ("[T]he Round Hill assessment bonds do not attempt to restrict the State of Nevada or the [Tahoe Regional Planning Agency] from promulgating and enforcing land use restrictions in the Lake Tahoe Basin.  Nor would such a promise have been legally binding. . . . [T]he police power and power of eminent domain are generally considered inalienable.  It is presumed that parties contract with knowledge that reservation of essential attributes of sovereign power is written into all contracts." (citation omitted)).  The provision is therefore inapposite here, where the State's taxation power would be incidentally barred as the consequence of prior litigation.

Accordingly, the company did not file or pay GET from 1985 to 1999. Id.

In 1999, the Director assessed MUC for unpaid GET for these years, arguing that MUC did not meet the statutory requirements to be an "insurance company." Id. at 183, 187, 166 P.3d at 356, 360. MUC appealed the assessments, arguing inter alia that the Director was estopped from denying its status as an insurance company because MUC had detrimentally relied on its classification by the insurance division--another agency of the State government. Id. at 193, 166 P.3d 366.

This court held that MUC was not an insurance company for purposes of the GET exemption and that the Director was not estopped from collecting the back-taxes. Id. at 194, 166 P.3d 367. The court reasoned that, although "generally, 'the doctrine of equitable estoppel is fully applicable against the government,'" "significant limitations have been placed on the doctrine in this context." Id. at 193, 166 P.3d 366 (quoting State v. Zimring, 58 Haw. 106, 126, 566 P.2d 725, 738 (1977); Filipo v. Chang, 62 Haw. 626, 634, 618 P.2d 295, 300 (1980)). One such limitation is that the doctrine cannot be applied to prevent the State from exercising its sovereign power. Id. (citing Filipo, 62 Haw. at 634, 618 P.2d at 300; Godbold v. Manibog, 36 Haw. 206, 214 (Haw. Terr. 1942)). Because it was "beyond dispute that the power of taxation is a sovereign power

of the state," the court reasoned that "the doctrine of equitable estoppel may not be applied against the government's power to tax." Id. at 194, 166 P.3d 367 (citing Fitzgerald v. City of Bangor, 726 A.2d 1253, 1255–56 (Me. 1999); PCS, Inc. v. Ariz. Dep't of Revenue, 176 Ariz. 628, 630, (Ariz. T.C. 1993)).

In so holding, this court quoted from Fitzgerald v. City of Bangor, a decision by the Supreme Judicial Court of Maine holding that estoppel is unavailable in tax cases in order "to assure that no officer of government has the ability to interfere inadvertently with the government's fundamental sovereign power to tax its citizens." 115 Hawai'i at 194, 166 P.3d at 367 (quoting Fitzgerald, 726 A.2d at 1255–56). The Maine court reasoned that taxation was "the paramount function of government by which it is enabled to exist and function at all." Fitzgerald, 726 A.2d at 1256 n.4 (quoting Me. Sch. Admin. Dist. No. 15 v. Raynolds, 413 A.2d 523, 533 (Me. 1980)). "An administrative officer charged with the duty of collecting taxes had neither the power to abrogate the state's sovereign power to tax nor the power to grant an exemption to a taxpayer," the court continued. Id. Accordingly, tax officials cannot prevent the government from exercising its fundamental tax authority by

33

intentional or unintentional acts, the court concluded.[27]  See
id.

The OTCs argue that "Medical Underwriters is about
equitable estoppel" and that "[t]he question of whether a taxing
authority may bring an action in the first instance (despite its
delay and/or the taxpayer's reliance) is very different from
whether a taxing authority is free to relitigate claims that
already were brought, or could have been brought, in a prior
action that resulted in a final judgment."

Equitable estoppel and res judicata share a common
ancestry; both "evolved from the medieval common law theory of
estoppel by matter in pais ('in the country' or 'on the land')."
Christopher Brown, A Comparative and Critical Assessment of
Estoppel in International Law, 50 U. Miami L. Rev. 369, 372
(1996).  The rule originally concerned the binding effect of
representations made in public.  Id.  As written records became
more common, res judicata split off and became a doctrine of its

---

[27]    It is noted that federal courts do not follow this rule in
federal tax litigation, and instead apply a higher standard in determining
whether equitable estoppel is available as a defense against the government's
power of taxation than in other contexts.  See Norfolk S. Corp. v. C.I.R.,
104 T.C. 13, 60 (1995), aff'd, 140 F.3d 240 (4th Cir. 1998) (holding
government may only be equitably estopped based on a mistake of law when "a
taxpayer can prove he or she would suffer an unconscionable injury" and
setting forth a five factor test for equitable estoppel based on misstatement
of fact).  It is therefore unsurprising that federal courts also consider res
judicata a potential defense against the government's taxation power when a
statute does not provide otherwise.  See, e.g., Erickson v. United States,
309 F.2d 760, 768 (Ct. Cl. 1962); Lenny v. Williams, 143 F.Supp. 29, 34 (N.D.
Ohio 1956).

own, premised on the official recording of court proceedings. Id. at 375.

"In spite of the historical association between estoppel by res judicata and the other forms of estoppel, the former is founded on vastly different principles." Id. Equitable estoppel, as its name implies, exists primarily to ensure fairness to litigants by protecting innocent parties and "prevent[ing] a party from profiting from his or her wrongdoing." Major League Baseball v. Morsani, 790 So.2d 1071, 1078 (Fla. 2001). Res judicata likewise protects litigants by "reliev[ing] parties of the cost and vexation of multiple lawsuits" and ensuring finality, thus permitting "reliance on adjudication." State by Price v. Magoon, 75 Haw. 164, 189, 858 P.2d 712, 724 (1993) (quoting Kauhane v. Acutron Co., 71 Haw. 458, 463-64, 795 P.2d 276, 278-79 (1990)).

But res judicata also serves to "conserve judicial resources" and "prevent[] inconsistent decisions." Id. The doctrine is an aspect of "the inherent ability of the judiciary to manage litigation and finally resolve cases," and some courts have held that efforts by the other branches of government to circumvent res judicata violate the separation of powers. Berkson v. LePome, 126 Nev. 492, 499-500, 245 P.3d 560, 565-66 (2010) (holding that a statute that permitted plaintiffs whose victories were reversed on appeal to file new actions violated

the separation of powers); accord Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 225 (1995) (holding that a statute permitting plaintiffs to refile actions previously dismissed as untimely violated separation of powers).

Thus, unlike equitable estoppel, res judicata is a rule not only "of fundamental and substantial justice" and "private peace" but of "public policy."  Magoon, 75 Haw. at 189, 858 P.2d at 724 (quoting Kauhane, 71 Haw. at 463-64, 795 P.2d at 278-79).  Some courts have classified this as the doctrine's primary purpose.  See Buromin Co. v. Nat'l Aluminate Corp., 70 F.Supp. 214, 217 (D. Del. 1947) ("The doctrine of res judicata is primarily one of public policy and only secondarily of private benefit to the individual litigants.  It has its roots in the maxim that it concerns the public that there be an end to litigation when one party has had a full and free opportunity of presenting all the facts pertinent to the controversy.")  Some commentators argue this distinction is significant enough that "in contemporary practice, [claim and issue preclusion] are not considered estoppels at all in spite of their nomenclature." Brown, supra, at 376.

This case therefore presents a conflict between competing doctrines.  On the one hand, Medical Underwriters held that estoppel defenses should not be available against the government in tax cases "to assure that no officer of government

has the ability to interfere inadvertently with the government's fundamental sovereign power to tax its citizens." 115 Hawai'i at 194, 166 P.3d at 367 (quoting Fitzgerald, 726 A.2d at 1255-56). On the other, res judicata implicates public policy and fundamental judicial powers such as the ability to finally resolve cases, and the doctrine potentially serves as a check on the other branches of government. Berkson, 126 Nev. at 500. This is to say that, without some form of preclusion, there is nothing to stop litigants--including the executive and legislative branches--from simply relitigating adverse determinations until they receive a favorable decision.

In light of the competing considerations of the sovereign power to tax versus the public policy of case finality, we also consider the doctrine of issue preclusion. Although both claim preclusion and issue preclusion were historically considered aspects of res judicata and are nominally forms of estoppel, when considered in relation to each other it becomes clear that the doctrines serve different purposes.

Claim preclusion "may be viewed as a rule of battle which forces one side to fire all of its guns at once rather than withhold some of its rounds for later in the battle." Brown, supra, at 375. It serves to conserve judicial resources by preventing a "multiplicity of suits" and to protect litigants

37

against the "cost and vexation of multiple lawsuits." Kauhane, 71 Haw. at 463, 795 P.2d at 278. It thus promotes finality generally in that it ensures all of the litigation related to a given incident or transaction is settled at once.

Issue preclusion, by contrast, protects the core judicial power to render final decisions as to facts and law in specific controversies. See Berkson, 126 Nev. at 500. Even in the absence of claim preclusion, issue preclusion makes judicial determinations conclusive and prevents a party from repeatedly litigating adverse decisions in the hopes of securing a more favorable outcome.

We held in Medical Underwriters that the actions of a specific government official may not deprive the State of Hawai'i of its sovereign power to collect the taxes it is legally due. 115 Hawai'i at 193-94, 166 P.3d at 366-67. Our reasoning holds equally true when those actions are in the context of a prior litigation, and the common law defense of claim preclusion is thus inapplicable against the State in tax cases. Id. This is not to say, however, that the State may relitigate adverse judicial tax decisions ad infinitum. The core judicial power to make binding determinations of issues that come before the courts remains protected by the doctrine of issue preclusion, which applies with full force in tax litigation.

Because the doctrine of claim preclusion is inoperative as a defense against the State's sovereign taxation power, the OTCs may not invoke it to bar the Director's enforcement of the tax assessments here at issue.[28] The tax court was therefore correct to deny the OTCs' cross-motion for partial summary judgment.

## B. GET Apportionment for Tourism Related Services

HRS § 237-18(f) permits travel agencies to pay GET on only the portion of their proceeds that they retain when the agencies split their gross income from arranging "tourism related services" with third-party service providers. Both parties challenge the tax court's conclusion that the provision applies categorically to services sold as part of a travel package. The Director argues that car rentals are not tourism related services within the meaning of the statute regardless of whether the rental is a component of a travel package. Conversely, the OTCs contend that vehicle rentals are covered by HRS § 237-18(f) irrespective of their inclusion in a package transaction.

---

[28] The OTCs have not raised issue preclusion as a defense, and it is therefore unnecessary for this court to determine whether the OTCs' GET liability for the assessed years would be an issue entitled to preclusive effect.

**1. The Presumption of Validity and Interpretory Balance**

As a threshold matter, the parties disagree as to the litigant in whose favor this court is obliged to interpret the governing GET statutes. The Director asserts that GET assessments are presumed correct and that it is the OTCs' burden to disprove their accuracy. By contrast, the OTCs argue that, under settled cannons of statutory construction, laws imposing taxes are construed strictly against the government with any doubt resolved in favor of the taxpayer. The Director responds that this court has recognized an exception to the general rule when a taxpayer seeks an exemption from a tax of general applicability, in which case the statute should be interpreted strictly against the taxpayer.

This court has held that GET assessments enjoy a presumption of validity under HRS § 232-13 (2017), which provides that "the assessment . . . shall be deemed prima facie correct." Travelocity, 135 Hawai'i at 114-15, 346 P.3d at 183-84 (emphasis omitted) (citing In re Valley of Temples Corp., 56 Haw. 229, 232, 533 P.2d 1218, 1220 (1975)). The use of the term prima facie, however, indicates that this presumption concerns the evidentiary burden of establishing sufficient facts to prevail. See Prima Facie Case, Black's Law Dictionary (10th ed. 2014) ("A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's

favor."); <u>Rivera v. Philip Morris, Inc.</u>, 125 Nev. 185, 190-91 (2009) ("The party that carries the burden of production must establish a prima facie case. The burden of production may be switched from one party to another by a presumption." (citations omitted)). It is therefore inapplicable to the Director's legal conclusions, which are reviewable <u>de novo</u> as questions of law. <u>Weinberg v. City & Cnty. of Honolulu</u>, 82 Hawai'i 317, 322, 922 P.2d 371, 376 (1996).

We have further recognized that, as applied in tax cases, there is a "rule of strict construction . . . . favoring the taxpayer on provisions imposing the tax or cutting against him on exemptions." <u>Honolulu Star Bulletin, Ltd. v. Burns</u>, 50 Haw. 603, 604, 446 P.2d 171, 172 (1968) (quoting <u>In re Taxes, Hawaiian Pineapple Co.</u>, 45 Haw. 167, 192, 363 P.2d 990, 1003 (1961)). We have held, however, that "the rule of strict construction with regard to taxing statutes is resorted to only 'as an aid to construction when an ambiguity or doubt is apparent on the face of the statute, and then only after other possible extrinsic aids of construction available to resolve the ambiguity have been exhausted.'" <u>Travelocity</u>, 135 Hawai'i at 121 n.47, 346 P.3d at 190 n.47 (quoting <u>Bishop Trust Co. v. Burns</u>, 46 Haw. 375, 399-400, 381 P.2d 687, 701 (1963)).

This court is therefore free to interpret GET statutes through normal tools of statutory interpretation and will resort

to the rule of strict construction only if these methods do not yield a clear answer.

## 2. The Text of the Statute

"Under general principles of statutory construction, courts give words their ordinary meaning unless something in the statute requires a different interpretation." Saranillio v. Silva, 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995) (citing Ross v. Stouffer Hotel Co. (Hawai'i), 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994)). Thus, "[t]he fundamental starting point of statutory interpretation is the language of the statute itself." State v. Alangcas, 134 Hawai'i 515, 525, 345 P.3d 181, 191 (2015) (citing Hawaii Gov't Emps. Ass'n v. Lingle, 124 Hawai'i 197, 202, 239 P.3d 1, 6 (2010)). "[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Schmidt v. Bd. of Dirs. of Ass'n of Apartment Owners of Marco Polo Apartments, 73 Haw. 526, 531–32, 836 P.2d 479, 482 (1992) (citations and quotes omitted).

HRS § 237-18(f) grants GET apportionment for "tourism related services [] furnished through arrangements made by a travel agency or tour packager" when "the gross income is divided between the provider of the services and the travel

agency or tour packager."[29]  The statute defines tourism related

services as "catamaran cruises, canoe rides, dinner cruises, lei

greetings, transportation included in a tour package,

sightseeing tours not subject to chapter 239, admissions to

luaus, dinner shows, extravaganzas, cultural and educational

facilities, and other services rendered directly to the customer

or tourist."  Thus, the statute on its face imposes three

requirements: 1) the arrangement is made by a travel agency or

tour packager; 2) the gross income from the transaction is

divided between the service provider and the travel agency or

tour packager; and 3) the service is a tourism related service,

defined as either one of the enumerated examples or "[an]other

service[] rendered directly to the customer or tourist."

---

[29]     HRS § 237-18(f) is restated here as follows:

(f)    Where tourism related services are furnished through
arrangements made by a travel agency or tour packager and
the gross income is divided between the provider of the
services and the travel agency or tour packager, the tax
imposed by this chapter shall apply to each such person
with respect to such person's respective portion of the
proceeds, and no more.

As used in this subsection "tourism related services" means
catamaran cruises, canoe rides, dinner cruises, lei
greetings, transportation included in a tour package,
sightseeing tours not subject to chapter 239, admissions to
luaus, dinner shows, extravaganzas, cultural and
educational facilities, and other services rendered
directly to the customer or tourist, but only if the
providers of the services other than air transportation are
subject to a four per cent tax under this chapter or
chapter 239.

(Emphasis added.)

As the Director acknowledges, this court determined in Travelocity that the first two requirements are generally met in transactions following the OTCs' merchant business model.[30]  135 Hawai'i at 108, 111, 346 P.3d at 177, 180 ("[F]or the purposes of the GET Apportioning Provision, the OTCs operate as travel agencies in the Assessed Transactions. . . . [I]n the Assessed Transactions, gross income is divided, as that term is used in the GET Apportioning Provision.").  Further, vehicle rentals are "services rendered directly to the customer or tourist" within the plain meaning of the provision, indicating that they would be tourism related services under a literal reading of the statutory definition.[31]

Rental cars also fall within the conventional understanding of tourism related services independent of the statutory definition.  As the OTCs point out, numerous publications marketed toward tourists visiting Hawai'i promote renting a car during a vacation, including many publications released by the State itself.  And the previous State Strategic

_____

[30]    This court held in Travelocity that the OTCs acted as travel agencies in the specific transactions there at issue.  135 Hawai'i at 108, 346 P.3d at 177.  Although we did not hold that the OTCs were travel agencies for all purposes, the Director does not dispute the OTCs' status as travel agencies in the transactions in this case.

[31]    As discussed infra, canons of statutory construction may in some instances justify departing from the plain meaning of this type of "catch-all" residual clause.

Tourism Plan expressly noted that rental cars are commonly thought of as part of the "visitor industry" due to the prominent role they play servicing tourists.  See Hawaiʻi Tourism Authority, Hawaiʻi Tourism Strategic Plan 2005-2015 at 8, 14, 16 ("When speaking about the 'visitor industry,' what generally comes to mind are those directly involved in hotels and other accommodations, airlines, car rental agencies, visitor attractions, tour operators, and restaurants and retail operations. . . . Currently, the primary transportation modes used by visitors are air carriers, cruise ships, ferries, public transportation vehicles, private buses, rental cars and taxis. . . . [N]early all visitors on the neighbor islands (and still many on Oʻahu) rely on tour buses, taxis or rental cars." (emphases added)).

Indeed, the Director ultimately does not dispute that "in a general sense, car rentals are part of the tourism industry."  The Director instead attempts to distinguish services that are part of the tourism industry from "tourism related services."  But--at least under the common understanding of the term--the distinction is unfounded.  A conventional dictionary defines "related" to simply mean "associated" or

"connected."[32]  Services that are part of the tourism industry are plainly associated or connected with tourism, and thus "tourism related" under the plain meaning of the phrase.

Because rental cars are tourism related services under both the plain-text of the statutory definition and conventional definitions of the term, the rental car transactions satisfy HRS § 237-18(f)'s third requirement.  The text of HRS § 237-18(f) therefore supports extending GET apportionment to the assessed rental car transactions.

### 3.  Legislative History

Even when the meaning of a law is apparent on its face, "[l]egislative history may be used to confirm [the court's] interpretation of a statute's plain language."  E & J Lounge Operating Co. v. Liquor Comm'n of City & Cty. of Honolulu, 118 Hawai‘i 320, 335, 189 P.3d 432, 447 (2008).  The legislative history of HRS § 237-18(f) indicates that the provision was intended to protect and encourage the growth of the Hawai‘i visitor industry.  The statute was enacted in 1986 as part of larger legislation concerning the taxation of tourism.  See 1986 Haw. Sess. Laws Act 340, § 7 at 767.  Both the report of the Senate Committee on Ways and Means and the conference

---

[32]    Related, Dictionary.com Unabridged, http://www.dictionary.com/browse/related (last visited Feb. 20, 2019).

committee report on the bill note that HRS § 237-18(f) was intended to alleviate the effects of pyramiding that "does not serve the interests of the State in encouraging tourism." S. Stand. Comm. Rep. No. 651-86, in 1986 Senate Journal, at 1077; Conf. Comm. Rep. No. 70-86, in 1986 House Journal, at 962.

In 1991, the legislature expanded the definition of "tourism related services" by adding six specific services and the catch-all clause for "other services rendered directly to the customer or tourist." See 1991 Haw. Sess. Laws Act 287, § 1 at 695. The report of the House Committee on Tourism stated that the change was intended to address "inequities [that] appear to exist in existing statutes regarding the assessment of the general excise tax on the revenues of travel-related companies." H. Stand. Comm. Rep. No. 140, in 1991 House Journal, at 891.

Together, these statements evince the legislature's intention that HRS § 237-18(f) promote tourism by affording favorable tax treatment to parties that facilitate recreational travel to the State. As this court observed in Travelocity, the legislature made similar statements when enacting HRS § 237-18(g), which provides GET apportionment for transient accommodations booked through a travel agency or tour packager, and HRS § 237-18(h), which provides GET apportionment when motor carriers contract together to provide transportation. See

47

Travelocity, 135 Hawai'i at 110, 346 P.3d at 179.  We noted that, in enacting HRS § 237-18(h), the legislature specifically "identified transportation as an element of the Hawai'i visitor industry that needed protection."  Id.  Considering the three provisions collectively, this court observed that "the legislature repeatedly sought to protect tourism-related industries."  Id. at 111, 346 P.3d at 180.  We therefore held that the analogous HRS § 237-18(g) GET apportionment provision "should not be given a constrained interpretation that would frustrate the legislative intent to protect the tourism industry."  Id.

The record indicates the OTCs' business model is designed to promote efficiency by providing global marketing for Hawai'i service providers and connecting customers with excess inventory and availability.  It reflects that the OTCs are often able to offer customers decreased prices due to the volume of their sales, as well as a central point from which visitors can book a variety of services at once.  The record therefore indicates that the OTCs' business model makes Hawai'i tourism cheaper for consumers, suggesting that the OTCs are the type of companies to which the legislature intended HRS § 237-18(f) to apply.

Further, the legislature expressly stated that the 1991 expansion of the definition of tourism related services was intended to eliminate "inequities" in the GET treatment of the income of "travel related companies"--a descriptor that the OTCs indisputably fit.  See Travelocity, 135 Hawai'i at 106, 346 P.3d at 175 (holding that the OTCs are "travel agencies," which is conventionally defined as, inter alia, "an office or enterprise engaged in selling, arranging, or furnishing information about personal transportation or travel" (quoting Webster's Third New International Dictionary 2433 (unabr. 1993)).  Thus, the legislative history of HRS § 237-18(f) supports extending GET apportionment broadly to the services offered by the OTCs that are rendered directly to a customer by a service provider with whom the OTCs divide the proceeds of the transaction.

### 4.    Canons of Statutory Construction

"Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words."  Yates v. United States, 135 S.Ct. 1074, 1081 (2015).  Courts consider the context in which the term occurs, including the role it plays in the larger statutory scheme.  Id. at 1081-82.  In situations in which a statute contains specific examples followed by a general term, courts have generally found sufficient ambiguity to turn to cannons of statutory construction in interpreting the general term.  See Peterson v.

49

Hawaii Elec. Light Co., 85 Hawai'i 322, 329, 944 P.2d 1265, 1272 (1997) ("If the general words are given their full and natural meaning, they would include the objects designated by the specific words, making the latter superfluous." (quoting Sutherland Statutory Construction § 47.17 (2000))), superseded on other grounds by HRS § 269-15.5 (2007).

The primary cannon employed in such instances is ejusdem generis,[33] which translates as "of the same kind or class." Ejusdem Generis, Black's Law Dictionary (10th ed. 2014). "The doctrine of ejusdem generis states that where general words follow specific words in a statute, those general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Asato v. Procurement Policy Bd., 132 Hawai'i 333, 352, 322 P.3d 228, 247 (2014) (quoting Singleton v. Liquor Comm'n of Hawai'i,

---

[33] This court has also employed a related doctrine, noscitur a sociis (literally, "it is known by its associates") which we have freely translated as "words of a feather flock together" or "the meaning of a word is to be judged by the company it keeps." Noscitur a Sociis, Black's Law Dictionary (10th ed. 2014); State v. Deleon, 72 Haw. 241, 244, 813 P.2d 1382, 1384 (1991). The doctrine "provides that the meaning of words may be determined by reference to their relationship with other associated words and phrases." Peterson, 85 Hawai'i at 328, 944 P.2d at 1271. Although the parties' briefs in this case analyze ejusdem generis and noscitur a sociis as separate doctrines, this court has held that ejusdem generis is an applied "variation" of noscitur a sociis. Id.; see also Noscitur a Sociis, Black's Law Dictionary (10th ed. 2014) ("The ejusdem generis rule is an example of a broader linguistic rule or practice to which reference is made by the Latin tag noscitur a sociis." (quoting Rupert Cross, Statutory Interpretation 118 (1976)).

111 Hawai'i 234, 242 n.14, 140 P.3d 1014, 1022 n.14 (2006)) (internal quotations omitted).  Courts employing the doctrine identify the commonality shared by the enumerated examples and use this commonality to limit the reach of the general term. See State v. Kahalewai, 56 Haw. 481, 489, 541 P.2d 1020, 1026 (1975).

As the OTCs argue, the Director has consistently failed to identify a commonality shared by all of the tourism related services identified in the statute--"catamaran cruises, canoe rides, dinner cruises, lei greetings, transportation included in a tour package, sightseeing tours, . . . admissions to luaus, dinner shows, extravaganzas, [and] cultural and educational facilities."  Both of the commonalities argued by the Director--that the activities are done primarily for enjoyment and that the services are ends in themselves rather than a means of enjoying other activities--are belied by the inclusion of "transportation included in a tour package," which fits neither description.  Thus, the only clear commonality among all of the enumerated tourism related services is that they are marketed and sold primarily (albeit not exclusively) to tourists.[34]

---

[34]    The tax court instead determined that the commonality between the ten items was that they "were part and parcel of . . . tour packages," and thus concluded that vehicle rentals are tourism related services only when

(continued . . .)

Notwithstanding the general applicability of ejusdem generis, this court has held that the cannons of statutory construction are only "aids in ascertaining and giving effect to the legislative intent, [and] these rules cannot be used in contravention of the purpose of the legislature by confining the operation of the statute within narrower limits than intended." State v. Prevo, 44 Haw. 665, 668-69, 361 P.2d 1044, 1047 (1961); see also Holi v. AIG Hawaii Ins. Co., 113 Hawaiʻi 196, 204, 150 P.3d 845, 853 (Ct. App. 2007) ("The doctrine of ejusdem generis 'is only applicable where legislative intent or language expressing that intent is unclear.'" (quoting Sutherland Statutory Construction § 47.18 (2000)). The cannons are also not a bar to applying the "sense of the words used which best harmonizes with the design of the statute or the end in view." Prevo, 44 Haw. at 669, 361 P.2d at 1047. Thus, this court is not required to employ ejusdem generis if it concludes the

_____

(. . . continued)

included in a travel package. Although there are some indications that the 1991 bill expanding the definition of tourism related services was initially introduced to add, inter alia, "transportation that is included in tour packages sold for package prices[] and other incidental services included within tour packages," see H. Stand. Comm. Rep. No. 140, in 1991 House Journal, at 891, the bill went through substantial revisions prior to enactment. See H. Stand. Comm. Rep. No. 683, in 1991 House Journal, at 1081 (noting revisions to clarify the provision covered "services rendered to the customer or tourist directly"). Presently, there is no indication in the text of the statute that it is limited to services included in tour packages, and both parties agree that "[a] 'stand-alone' luau is included within HRS § 237-18(f) to the same extent as a luau purchased as part of a package."

legislature clearly intended HRS § 237-18(f) to include or exclude the assessed rental car transactions or if it finds that the doctrine is in disharmony with the design of the statute.

Here, HRS § 237-18(f) provides that tourism services may be "rendered directly to the customer or tourist," implying that it is not a prerequisite for the term's application that the service be primarily marketed and sold to tourists. (Emphasis added.) And, as stated, the provision is limited by two other requirements: the service must be arranged by a travel agency or tour packager, and the income from the transaction must be divided between the arranger and the service provider. Our decision in Travelocity established that, to qualify as a travel agency, a business must generally be "engaged in selling, arranging, or furnishing information about personal transportation or travel" or "engaged in selling and arranging transportation, accommodations, tours and trips for travelers." 135 Hawai'i at 106, 346 P.3d at 175.[35] Thus, applying the literal meaning of the catch-all clause of HRS § 237-18(f)--that is, interpreting the clause to encompass all services provided directly to a customer--does not create an unbounded GET

_____

[35] (Quoting Travel Agency, Webster's Third New International Dictionary 2433 (unabr. 1993); Travel Agency, Merriam-Webster, http://www.merriam-webster.com/dictionary/travel%20agency (last visited Sept. 17, 2014).)

exemption.  The provision covers only transactions by a party whose business model centers on arranging travel services, and only when those services are rendered directly to the consumer by a third-party service provider with whom the proceeds are divided.

Such an interpretation avoids the unequal tax treatment disfavoring travel facilitators that would result if this court were to apply ejusdem generis.  Many services commonly used by tourists would likely not qualify as primarily marketed or sold to tourists--which is, as stated, the only clear commonality shared by all the enumerated examples of "tourism related services" included in HRS § 237-18(f).  For example, spa or massage treatments are in all likelihood enjoyed by locals and tourists in similar measure.  Under an ejusdem generis interpretation of HRS § 237-18(f), a spa service sold directly to a customer by the spa provider would be subject to GET only once.  By contrast, the same spa service sold to a tourist for the same price as part of a package arranged by a travel agent would be taxed twice--once on the full amount tendered to the arranger and once on the amount remitted to the spa provider.

As discussed supra, the legislature enacted the 1991 expansion of HRS § 237-18(f) that added the catch-all clause to the definition of tourism related services specifically to

correct "inequities [that] appear to exist in existing statutes regarding the assessment of the general excise tax on the revenues of travel-related companies." H. Stand. Comm. Rep. No. 140, in 1991 House Journal, at 891. It is apparent that applying the doctrine of ejusdem generis would produce a result that would be inconsistent with the legislative goal of promoting Hawaiʻi tourism by providing special tax treatment to companies that facilitate travel to the State.

Given these indications of incompatibility, we decline to apply the doctrine of ejusdem generis, and instead interpret "tourism related services" in accordance with its plain text and legislative history to include all services rendered directly to customers that satisfy HRS § 237-18(f)'s other requirements for GET apportionment. Accordingly, the provision of rental vehicles is a "tourism related service" within the meaning of the statute, and the tax court erred by failing to apply GET apportionment to the assessed stand-alone rental car transactions.

## IV. CONCLUSION

Based on the foregoing discussion, we hold that the claim preclusion component of res judicata is not an available defense against the government's sovereign power of taxation, and all assessments in this case are therefore considered on the merits. We further hold that car rentals are tourism related

services that qualify for GET apportionment under these circumstances. Accordingly, we vacate the tax court's Stipulated Order and Final Judgment Disposing of All Issues and Claims of All Parties and remand this case for recalculation of the OTCs' GET liability and associated penalties and interest.

Paul Alston
Ronald I. Heller
Pamela Bunn
for petitioners/taxpayers-
appellants-appellees-cross-
appellants

Gary Cruciani, *pro hac vice*
Steven D. Wolens, *pro hac vice*
Kenneth T. Okamoto
Robert A. Marks
Cynthia M. Johiro
Warren Price III
Hugh R. Jones
for petitioner/appellee-
appellant-cross-appellee

Thomas Yamachika
for amicus curiae
Tax Foundation of Hawaiʻi

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

